**UNITED STATES of America**

v.

**Ronald CRANDELL.**

**Criminal Action No. 06–232 (JAG).**

United States District Court,
D. New Jersey.

Sept. 7, 2007.

Jenny Kramer, Esq., Phillip Kwon, Esq., Assistant United States Attorneys, Office of the United States Attorney, Newark, NJ, for the United States of America.

Lisa M. Mack, Esq., Louise Arkel, Esq., Peter Carter, Esq., Assistant Federal Public Defenders, Office of the Federal Public Defender, Newark, NJ, for Defendant Ronald Crandell.

## OPINION

GREENAWAY, JR., District Judge.

This matter comes before this Court on defendant Ronald Crandell's ("Defendant" or "Crandell") motion to suppress evidence recovered in connection with a stop and frisk conducted on July 15, 2005. The question presented is whether an anonymous tip that "a black male with dreadlocks and blonde tips[,] wearing a tan shirt and blue jeans" was carrying a gun in the small of his back is, without more, sufficient to justify a police officer's stop and frisk. This Court finds that it is not. The stop and frisk violated Defendant's Fourth Amendment right to be free from unreasonable search and seizure. The fruits of the stop and frisk, namely a handgun, were tainted by the unconstitutionality of the stop. Defendant's motion to suppress the evidence seized after the stop shall be granted.

### BACKGROUND

This case is about an anonymous tip. Defendant's motion to suppress focuses on an anonymous tip received by officers of the Hoboken Police Department on July 15, 2005, through the dispatch at headquarters. Although the testimony of the officers differed slightly regarding the specific information contained in the anonymous tip, the gist appears in the police report: "a black male with dreadlocks and blonde tips[,] wearing a tan shirt and blue

jeans [ ] in possession of a handgun on his waistband (small of his back)." [1]

Defendant argues that 1) the anonymous tip lacks any indicia of reliability to supply the requisite reasonable suspicion necessary to effect a *Terry* stop; 2) the anonymous tip lacks any predictive information that could have been corroborated by the officers; 3) the anonymous tip provides no information from which the police could judge the reliability or veracity of the tip; and 4) the officers lacked any other grounds to stop and search Defendant.

The Government argues that the tip was sufficiently specific to lead the officers to the area and that the tip was corroborated by the officers' previous experience with the Defendant. The Government also ar-

gues that a ruling against it creates an unreasonable expectation of police officers in situations similar to the one at hand. The parties fleshed out their arguments during testimony from two officers of the Hoboken Police Department.[2]

*Testimony of Officers Drishti and Valez*

Officer Arbend Drishti testified that, on July 15, 2005, he and two other Hoboken police officers were on foot patrol in the Hoboken Housing Authority. (T5:20–23). Officer Drishti described the Housing Authority as approximately twenty buildings located in an area that measures four blocks by two blocks. (T7:12–24). While on patrol, Officer Drishti received a call on his cellular phone from dispatch of an anonymous tip.[3] (T6:7–10). Drishti testi-

---

**1.** The anonymous tip was recorded in the police log, which was entered into evidence as Government Exhibit Two ("Exhibit G–2"). The log describes the tip:

> [M]ale is wearing tan shirt, blue jeans, 5'5['] in height with long dreads with blonde tips[.]
> [C]aller stated he can see the impression of the gun in the back of the male['s] shirt[.]
> [C]aller stated this same male was shooting his gun [ ] by 501
> [M]arshall [Drive two] nights ago at about 11:30 [p.m. to] 12 a.m.

The additional information, as it appears in the police log—height and position of the handgun—adds little to the Government's case. The caller is more specific about physical characteristics, indicating Defendant's height. Arguably, the caller appears to be witnessing the event contemporaneously based on this version of the tip. However, neither police officer recalled this aspect of the tip.

Only Officer Arbend Drishti, one of three Hoboken police officers, including Officer Angel Valez and Officer Jimmy Miller, who responded to the tip, testified as to the location of the gun. Even after the Government used Exhibit G–2 to refresh the recollection of Officer Valez, Valez did not testify as to the location of the gun.

Further, neither officer mentioned any connection between Defendant and Marshall Drive. Indeed, when Officers Drishti, Valez,

and Miller received the anonymous tip through dispatch, they did not proceed to Marshall Drive. Instead, the officers proceeded to the intersection of Fifth and Jackson, an area that "[Crandell] frequents ... a lot." (T9:19–20) (this abbreviation refers to the transcript of the hearing held before this Court on November 28, 2006). This suggests that the officers could not have remembered the Marshall Street portion of the dispatch.

What the officers remember of the dispatch is significant because "[t]he reasonableness of official suspicion must be measured by what the officers *knew* before they conducted their search." *Florida v. J.L.*, 529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000).

**2.** The parties were heard by this Court on November 28, 2006.

**3.** Officer Drishti explained that he received a call from dispatch on his cellular phone, and not his police radio, because officers patrolling this particular area of Hoboken know that many individuals have police scanners. (T6:15–21). Thus, calls from dispatch over the police radio often result in the disbursement of the activity referred to in the call prior to the officers arriving at the scene. (T6:15–21). Officer Drishti did not receive the call directly from the anonymous tipster.

fied that the call described a "male, black male, with dreadlocks with blonde tips, wearing a tan shirt and blue jeans [ ] with a handgun in the small of his back." (T6:7–10). Officer Drishti received the call while he and Officers Angel Valez and Jimmy Miller were standing at the corner of Fourth Street and Jackson Street. (T8:9). Drishti testified that upon hearing the tip, he thought immediately of the defendant, Ronald "Ricky" Crandell.[4] (T7:7–11).

Upon receipt of the tip, Drishti relayed the tip's information to the other two officers, Officers Valez and Miller. (T40:13–24). Officer Valez recalled that the tip stated that "a black male wearing blue jeans and a tan shirt and a towel on his head ... with dreadlocks with gold tips ... had a weapon in his possession."[5] (T40:21–24). Officer Valez also testified that he immediately thought of Ricky Crandell upon hearing the tip. (T41:2–5). Valez based this assumption on his knowledge that Defendant had been arrested several times and because Valez had seen Defendant's picture at roll call (on other occasions, not on July 15, 2005). (T41:6–14). Officer Miller did not testify at the hearing.

After receiving the call, the three officers proceeded immediately to the intersection of Fifth and Jackson. (T8:15–16). They chose to proceed to this area because, according to Officer Drishti, "we [knew] Mr. Crandell frequents that area a lot." (T8:19–20). Officer Drishti added, and Officer Valez agreed, that they also chose the area because it is known as a "high-crime area." (T8:19–23 and T41:19–25). The officers searched unsuccessfully for Defendant at this location. (T9:6–8).

The officers crossed Jackson and traveled South along Jackson toward Fourth Street. (T9:9–10). Approximately halfway between Fourth Street and Fifth Street, the officers saw Defendant walking toward them. (T9:19–21).

Officer Drishti testified that Crandell was wearing a tan shirt, blue jeans, and that Crandell's hair was in dreadlocks with blond tips. (T11:6–8). Drishti stated that Defendant had a "small [ ] hand towel" on his head and was carrying a plastic shopping bag in his right hand. (T9:19–25 to T10:1–5). Officer Drishti also testified that "[t]here's not too many people in the project ... that have the dreadlocks with the blond tips." (T10:10–11). Drishti did not include in his police report that Defendant was wearing blue jeans and a tan shirt. (T19:23–25).

Officer Valez testified that Defendant was wearing "loose jeans" and a "tan shirt." (T66:20). Valez testified that he was unsure whether he could see Crandell's dreadlocks beneath the towel. (T51:3–22). When questioned as to whether he could see the gold tips of Defendant's dreadlocks, Officer Valez responded, "I know his face." (T51:8). Officer Valez testified that, prior to stopping Defendant, Valez thought he did not have probable cause to stop him. (T55:5–8). Officer Valez did not provide a direct answer when questioned (three times) as to whether he had a reasonable suspicion sufficient to stop Defendant. (T54:1 to T55:17). Valez further testified that he was uncertain as to the difference between probable cause and reasonable suspicion, and that he would have to "look it up." (T55:18–21). Eventually, Valez testified that he "didn't

---

4. Officers Drishti and Valez both testified that the tip did not include a location. (T7:2–4, T47:5–7).

5. Officer Valez testified at the hearing that Crandell was wearing a towel on his head on the day of his stop. This detail was not included in the tip. (Gov't's Ex. G–2).

know whether [he] had the legal right" to stop Defendant, which was why he asked for consent for the pat down after stopping Defendant. (T56:15–19).

Officer Drishti testified that Defendant, upon seeing the officers, did not react. Defendant simply kept walking toward them. (T20:25 to T21:1). The three officers approached Defendant immediately in a semi-circle or line. (T26:13–14). All three officers were uniformed. (T:51:25 to T52:2). Officers Drishti and Valez testified that Valez spoke to Defendant. (T21:3; T53:23–25).

The testimony of Officers Drishti and Valez differs slightly with regard to what was said to Defendant and the order in which it was said. Valez testified: "[A]s [Defendant] walked towards [sic] us, I stopped him ... and I told him I received information that [he] might have a weapon on [him] and I wanted to give [Defendant] a pat down for our protection[.] I told [Defendant] he was free to leave at any time." (T44:3–8). Officer Valez testified that Defendant "put his arms up ...." (T44:12).

At that point, Officer Valez testified that he began the pat down. (T44:12–13). Valez testified that "as I was patting [Defendant] down, he hit my arm, he turned around and he ran [and] the weapon fell from the back of his pants." (T44:13–14).

Officer Drishti's testimony on direct examination was that:

Officer Valez said to [Defendant,] is it all right if we pat you down for our safety? You can leave at any time.

And [Defendant] said, yeah, what's this all about?

[Defendant] started to get towards the fence [-] there was a fence there. I was on [ ] Officer Valez's left, Officer Miller was on his right, and as he was picking up to put his hand like towards

[sic] the fence, he was asking, what's this all about.

And Officer Valez said, we got a call you might have a handgun on you.

At that moment, as Officer Valez started to try to pat him down, he may have touched him once or twice, as soon as he got like towards the back area, [Defendant] turned abruptly and like knocked [Officer Valez's] arm to the side and a handgun flew from the lower back area onto the sidewalk, and [Defendant] then proceeded to run south on Jackson....

(T11:9–25). Officer Drishti testified that the whole event took approximately two seconds. (T12:5).

In Valez's account, he notifies the Defendant of the call regarding the weapon before beginning the pat down. (T44:3–8). In Drishti's account, Valez requests the pat down for safety and mentions the tip only after the pat down begins and after Defendant asks "what's this all about." (T11:11–18). In either account, it is clear that the three officers stopped Defendant first, and then immediately requested consent to search him.

Officer Miller then secured the weapon. (T12:9–12). Officers Drishti and Valez gave chase, following Defendant into the building at 320 Jackson Street. (T12:16–21). Officer Drishti testified that they proceeded immediately to the roof and searched every apartment on the top two floors before returning to the street. (T31:21–24). The officers then returned to headquarters and placed the handgun in evidence and issued six warrants for the arrest of Defendant. (T13:10–12). Officer Drishti wrote the police report summarizing the events. (T13:16–17). Defendant was apprehended subsequently by a bounty hunter and turned in to police headquarters. (T14:14–17).

## DISCUSSION

### I. Governing Legal Standards

#### A. Supreme Court Precedent

The Supreme Court has spoken on the subject of anonymous tips on two occasions in recent memory. The Court spoke on this topic in *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), and *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). These precedents are critical to this Court's determination of whether the stop and frisk of Mr. Crandell can withstand constitutional scrutiny.

#### 1. *Alabama v. White*

The Supreme Court of the United States addressed squarely the sufficiency of an anonymous tip to justify a police officer's stop and frisk in *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Corporal B.H. Davis of the Montgomery Police Department received an anonymous tip that the defendant, Vanessa White, would be leaving a specific address, at a specific time, and in a brown Plymouth station wagon with a broken taillight. *White*, 496 U.S. at 327, 110 S.Ct. 2412. The tipster continued that she would drive to a specific motel while in possession of cocaine in a brown attache case. *Id.*

Corporal Davis and his partner proceeded to the address provided by the tipster at the specified time. The officers saw a brown Plymouth station wagon with the right taillight broken, parked in front of the provided address. They observed White leave the building and enter the station wagon. The officers followed her as she took the most direct route to the motel specified by the tipster. *Id.* The officers stopped White's vehicle just short of the motel. *Id.*

Corporal Davis asked her to step to the rear of the car and informed her that she had been stopped because she was suspected of cocaine possession. Davis then requested, and received, consent to search the vehicle. The officers found a locked, brown attache' case in the car. Defendant provided the combination, upon request, and the officers discovered marijuana in the case. The officers placed White under arrest. During processing at the police station, three milligrams of cocaine were uncovered in White's purse. White was charged with possession of marijuana and possession of cocaine. *Id.*

The *White* Court concluded that "under the totality of the circumstances[,] the anonymous tip, as corroborated, exhibited sufficient indicia of reliability to justify the investigatory stop of [White's] car." *Id.* at 332, 110 S.Ct. 2412. In reaching its decision, the Court focused on 1) the independent corroboration undertaken by the officers, and 2) the details provided in the tip.

The Court outlined the independent corroboration by the officers, noting that the officers did not verify every portion of the tip, i.e., the name of the woman. *Id.* at 331, 110 S.Ct. 2412. However, the officers did note a woman leaving the specific address and entering a specific vehicle. Further, the officers followed her on route to the location predicted by the tipster (even though they stopped her before she reached her destination). *Id.* "[I]t is not unreasonable to conclude in this case that the independent corroboration by the police of significant aspects of the informer's predictions imparted some degree of reliability to the other allegations made by the caller." *Id.* at 331–32, 110 S.Ct. 2412.

"We think it also important that ... 'the anonymous [tip] contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted.'" *Id.*

at 332, 110 S.Ct. 2412 (quoting *Illinois v. Gates*, 462 U.S. 213, 245, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). The Court distinguished between the information contained in the tip which bolstered the reliability of the tipster from that which did not. The officers' discovery of a car matching the description given by the tipster is information easily obtainable by the general public. The Court focused on the predictive information in the tip. "What was important was the caller's ability to predict [White's] *future behavior*, because it demonstrated inside information—a special familiarity with [White's] affairs." *Id.*

The *White* Court did not diminish the significance of the tip being anonymous. The Court recognized that "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity...." *Id.* at 329, 110 S.Ct. 2412. The Court also noted that the fact pattern presented a "close case."

### 2. *Florida v. J.L.*

The Supreme Court also addressed the reliability of anonymous tips ten years after *White*, in *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). In *J.L.*, an anonymous caller reported to the Miami–Dade Police Department that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *J.L.*, 529 U.S. at 268, 120 S.Ct. 1375. No recording was made of the tip. The tipster provided no information about himself. *Id.*

After an unspecified period of time, two officers responded to the bus stop described in the tip. *Id.* The officers arrived at the bus stop approximately six minutes later and witnessed three black males " 'just hanging out [there].' " *Id.* The officers saw no firearm and they did not witness any threatening or unusual movements. *Id.* The officers approached and

one officer "told [J.L.] to put his hands up on the bus stop, frisked him, and seized a gun from J.L.'s pocket." *Id.* J.L. was subsequently charged under state law with carrying a "concealed firearm without a license" and possessing a firearm while under the age of eighteen. *Id.* at 269, 120 S.Ct. 1375.

The Supreme Court held that, under these circumstances, the officers lacked reasonable suspicion to conduct a *Terry* stop. The officers' suspicion arose solely from the tip—"a call made from an unknown location by an unknown caller." *Id.* at 270, 120 S.Ct. 1375. The Supreme Court continued, "[a]ll [that] the police had to go on in this case was the bare report of an unknown unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.* at 271, 120 S.Ct. 1375. As such, the Court reasoned, the tip lacked "the moderate indicia of reliability," such as "predictive information," necessary to allow the officers to test the tipster's credibility. *Id.*

In so ruling, the Supreme Court rejected specifically three arguments regarding anonymous tips. First, the Court declined to create a "firearm exception" to the *Terry* analysis. *Id.* at 272, 120 S.Ct. 1375. The State of Florida and the United States both argued that under such an exception, tips alleging possession of an illegal gun should justify a stop and frisk *per se*. *Id.* The Court recognized the dangerous nature of firearms, but declined to create such an exception. The Court reasoned that "[s]uch an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun." *Id.* The Court also expressed fear that such an exception would spread to the

illegal substances context and, thereby, swallow the rule. *Id.* at 273, 120 S.Ct. 1375.

Second, the Court rejected a three-pronged test proposed by the United States for allowing a *Terry* stop in the case of anonymous tips alleging firearm possession. The United States argued that *Terry* stops should be allowed "when (1) an anonymous tip provides a description of a particular person at a particular location illegally carrying a concealed firearm, (2) police promptly verify the pertinent details of the tip except the existence of the firearm, and (3) there are no factors that cast doubt on the reliability of the tip...." *Id.* at 271, 120 S.Ct. 1375. The Court stated that such a test "misapprehend[s] the reliability needed for a tip to justify a *Terry* stop." *Id.* at 272, 120 S.Ct. 1375.

As Justice Ginsberg opined in the majority opinion, such a tip is reliable only in that it will help the police correctly identify the correct person the tipster intends to accuse. *Id.* To create reasonable suspicion, the tip must be "reliable in its assertion of illegality, not just its tendency to identify a determinate person." *Id.*

Finally, the government argued that J.L.'s youth made the stop and frisk valid because it is a crime for a person under 21 to carry a concealed firearm in Florida.[6] In a footnote, Justice Ginsberg dismissed this argument. "Even assuming that the arresting officers could be sure that J.L. was under 21, they would have had reasonable suspicion that J.L. was engaged in criminal activity *only if* they could be confident that he was carrying a gun in the first place." *Id.* at 273, 120 S.Ct. 1375 (emphasis added). She continued "[t]he mere fact that a tip, if true, would describe

illegal activity does not mean that the police may make a *Terry* stop without meeting the reliability requirement." *Id.*

### 3. Supreme Court Conclusions

*White* and *J.L.* make it clear that police officers cannot rely on "the bare report of an unknown, unaccountable informant who neither explained how he knew [certain information] nor supplied any basis for believing he had inside information about [the suspect]." *J.L.*, 529 U.S. at 271, 120 S.Ct. 1375. The Supreme Court did uphold the stop in *White*, but placed a great emphasis on the predictive information contained in the tip and the corroborative police work which verified that predictive information. These aspects were not present in *J.L.* and the Supreme Court did not uphold the stop and frisk.

Based on the holdings in *White* and *J.L.*, it is clear that the Supreme Court requires, at the very least, predictive information and independent, corroborative police investigation to justify a *Terry* stop based on an anonymous telephonic tip.

### B. Third Circuit Jurisprudence

Shortly after the *J.L.* decision, the Third Circuit addressed anonymous tips in *United States v. Valentine*, 232 F.3d 350 (3d Cir.2000) and *United States v. Nelson*, 284 F.3d 472 (2002).[7]

### 1. United States v. Valentine

In *Valentine*, the Third Circuit held that officers had reasonable suspicion to stop the defendant, Valentine, based on a face-to-face, anonymous tip. The *Valentine* Court found reasonable suspicion because, *inter alia*, (1) the tip was face-to-face, (2)

---

6. At the time he was stopped, J.L. was ten days short of his sixteenth birthday.

7. The Government relied on *J.L.* and *Valentine* in its brief and at oral argument. (T75:10 to T78:25). The Government did not address *Nelson*.

the officers "were in a high crime area at 1:00 a.m.," and (3) Valentine walked away when he saw the police approach. *Valentine*, 232 F.3d at 357.

Two officers patrolling an area they professed to be "very bad" were flagged down by a tipster. The tipster explained that he had just seen a man with a gun. *Id.* at 352. The tipster described the gunman as "wearing a blue sweat top, blue pants, and a gold chain." *Id.* The tipster added that the gunman had dark skin, a beard, and was accompanied by a younger black male. *Id.* One officer asked when the tipster saw the gun, to which the tipster responded "[a]bout—maybe a second ago, two seconds ago." *Id.* at 354. The tipster refused to identify himself. *Id.* at 352–53. The officers asked no further questions and proceeded to seek out the individual described by the tipster.

Approximately 50 to 100 feet north of where the tipster had stopped the officers, they saw three men in a parking lot. One of the men matched the tipster's description. The second was a young, black male, approximately in his twenties. *Id.* at 353.

The uniformed officers pulled up and exited their marked police car. *Id.* The three men began to walk away when they saw the officers. Officer Contreras ordered the younger man to stop. *Id.* The young man complied, and walked with his hands up towards the police car. *Id.* Officer Woodard told Valentine, the man described by the tipster, to come over and place his hands on the car. *Id.* Valentine responded, "Who, me?" and immediately rushed Officer Woodard. Woodard wrestled Valentine to the ground, and in the ensuing scuffle a handgun fell from Valentine's person. *Id.* Valentine was prosecuted for being a felon in possession of a firearm. *Id.*

The *Valentine* Court described its anonymous tip as being more reliable than the

tip provided in *J.L.* because of the way it was received. First, the *Valentine* Court held that the tip was more reliable because the officers knew that the tipster was responding to something he had observed very recently. *Id.* at 354 (citing *Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (the Supreme Court recognizes the greater weight carried by a witness's recent report, i.e., when the victim of a street crime immediately seeks police aid and gives a description of the assailant)).

Second, the *Valentine* Court deemed the tip more reliable because it was delivered face-to-face. *Id.* at 354. The Court emphasized that a face-to-face tip gives the officer the opportunity to judge the tipster's credibility and reliability first hand. *Id.* at 354. The Court also emphasized the increased reliability of the tip when it is provided in close proximity to the suspect. The Circuit held that these tipsters risk retaliation, and, therefore, should be deemed more reliable. *Id.* at 354.

The *Valentine* Court also considered the surrounding circumstances in finding reasonable suspicion. *Id.* at 355. In considering the "broader context," the Circuit noted that "Valentine was walking around at 1:00 a.m. in a high crime area known for shootings." *Id.* at 356. The Court further noted that "it is well established that officers are allowed to ask questions of anyone ... without having any evidence creating suspicion." *Id.* at 356 (citing *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). As such, the Court highlighted the importance of Valentine "walking away" when the police arrived. *Id.* at 357. Such action is not headlong flight, the Court reasoned, but is "a factor that can be considered in the totality of the circumstances." The Court cited nothing in the content of the tip which would increase its reliability.

## 2. *United States v. Nelson*

In 2002, this Circuit again addressed a *J.L.* tip. In *United States v. Nelson*, the Third Circuit upheld reasonable suspicion based on an anonymous tip and the events surrounding its investigation. While on night duty, Lieutenant Zacche of the Jersey City Police Department received a telephone call on a private line used only by officers' families and confidential tipsters. *Nelson*, 284 F.3d at 475. The caller requested a specific officer of the narcotics division. *Id.* When informed that the officer was not available, the tipster provided the tip. *Id.* He told Zacche that two black males were conducting armed holdups of drug dealers. *Id.* The tipster stated that the two men were driving a gray BMW with license plates in the rear windshield. The caller provided an approximate intersection and indicated that the men's criminal activity was ongoing. *Id.*

Zacche immediately broadcast the contents of the tip and proceeded to the location to attempt to locate the two men. *Id.* A second call came from a pay phone in the area described by the tipster, also reporting that "two black men in a gray BMW with temporary license plates were 'riding around sticking up people.'" *Id.* at 475. This call was also broadcast.

Officers pulled over a gray BMW, in which Nelson was a passenger, based on the two broadcasts. The officer that approached Nelson's side of the car saw a handgun in Nelson's waistband in plain view. *Id.* at 475–76. The officer asked Nelson to step out of the car and arrested him. *Id.* at 476.

In determining that the officer had reasonable suspicion sufficient to justify a *Terry* stop, the Court "assess[ed] whether the communications to the police possessed sufficient indicia of reliability, when considering the totality of the circumstances."

*Id.* at 481. The *Nelson* Court noted that "no one disputes that the gray BMW with a tag in the back window and two black males inside matched precisely the broadcast information; nor that the car was on the road described in the first broadcast." *Id.* That the Circuit went on to do a more in depth analysis suggests that it was looking for more than a match of the physical description of the car and its occupants.

First, the Court found an increased reliability in how the tip was delivered. Zacche received the call on a private line used only by family members and informants. The caller asked for a specific officer. The Court reasoned that "the informant was not truly anonymous, because both the caller and Lieutenant Zacche knew that another officer could potentially identify the caller." *Id.* at 482. Thus, "the risk [of identification] increased the reliability of the caller." *Id.*

The tipster also delivered the tip in a manner which indicated that he was a recent victim of the criminal activity— "'they're running *our* pockets' and 'sticking *us* up man. You better do something.'" *Id.* at 482 (emphasis in the original). The Court pointed to *Valentine* in stating that "reports of present or imminent crime in a high crime area at a suspicious hour warrant a response." *Id.*

*Nelson* also addressed the content of the tip as providing "particularized knowledge." The tip provided both specialized knowledge (of a type of crime not generally known to the public), and alleged ongoing criminal activity, both of which the Court considered important to its holding for reasonable suspicion. *Id.* The tip, specifically the first call, "provided to [Lieutenant] Zacche [information that] conformed to [Zacche's] specialized knowledge of a pattern of criminal activity and to the location where the activity had been occur-

ring, and utilized certain language that was peculiar to those criminal activities."[8] *Id.* "[W]hat made the knowledge [in the tip] 'particularized' was the way in which the specific details of language, type of activity and location matched a pattern of criminal activity known to the police, but not to the general public." *Id.* at 484. As such, the tipster did not need knowledge of Nelson's future behavior. *Id.*

In further distinguishing *J.L.*, the Court pointed to the tip's allegations of violent crimes being committed. *Id.* at 483. The Court emphasized the difference in simply possessing a gun, as in *J.L.*, and using a gun to commit violent crimes, as in *Nelson.*

8. Interestingly, the *Nelson* Court held that "[t]he second broadcast, standing alone, would not have possessed sufficient indicia of reliability—it was wholly anonymous and received on a generally available telephone line, even though it did originate from a high-crime area and was reporting current criminal activity." *Nelson*, 284 F.3d at 482.

9. The Government also argues that under *United States v. Drayton*, 536 U.S. 194, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002), the officers could have approached Defendant to ask questions even without the anonymous tip, (T84:1), and, therefore, the gun was not seized pursuant to the pat down. (T109:22 to T111:6). At oral argument, the Government posited, upon request of this Court for Supreme Court precedent pertaining to *Florida v. J.L.,* that the officers were justified in stopping Crandell based on the holding of the Supreme Court in *United States v. Drayton.*

In *Drayton*, as part of a routine drug and weapons interdiction effort, three officers boarded a bus to interview passengers. *Drayton*, 536 U.S. at 197, 122 S.Ct. 2105. One officer stood at the front of the bus facing back and a second officer stood at the back of the bus facing forward. *Id.* at 197–98, 122 S.Ct. 2105. A third officer, Officer Lang, proceeded up the aisle to interview passengers. *Id.* at 198, 122 S.Ct. 2105.

The officers testified that any passenger who wanted to leave could do so, without argument. *Id.* Lang approached the defendants, showed his badge and stated that the police were looking for drugs and weapons.

This fact, the Court argued, further separated the fact patterns. *Id.* at 483–84.

## ANALYSIS

At the motion hearing, the Government made several arguments. First, the tip contained indicia of reliability sufficient to create reasonable suspicion. (T104:15 to T106:5). Second, the Government argues that *Valentine*, not *J.L.*, is more analogous to the case *sub judice*. Third, the Government argues that a ruling against it creates an unreasonable expectation of officers who receive anonymous tips regarding illegal activity. Fourth, the Government argues that the officers had Defendant's consent to stop and search him.[9]

*Id.* Lang asked if the men had any bags and then requested permission to check them. *Id.* at 199, 122 S.Ct. 2105. One defendant agreed and his bag was checked, producing no contraband. *Id.* Lang then asked if he perform a pat down on one of the defendants. *Id.* Lang discovered cocaine strapped to the defendant's inner thighs. *Id.* Lang then requested permission to check the other defendants' person. *Id.* The check also revealed cocaine. *Id.*

Both men were arrested and attempted to suppress the evidence because their consent to the pat down was invalid. The Supreme Court held that "[t]he Fourth Amendment does not require police officers to advise bus passengers of their right not to cooperate and to refuse consent to searches." *Id.*

This Court understands the Government's argument to be as follows: absent the tip, the officers would have been allowed to approach Defendant and request a pat down. In the clearly more restrictive situation in *Drayton*, the officers were allowed to request consent, and, therefore, the officer should be able to make such a request here. Therefore, because Defendant consented to the pat down, the seizure of the weapon was constitutional. The Government focuses on the quote from *Drayton* that "[e]ven when law enforcement officers have no basis for suspecting a particular individual, they may pose questions for identification and request consent to search provided they do not induce cooperating by coercion." *Id.* at 201, 122 S.Ct. 2105 (citing

Defendant disagrees, arguing that the tip in this case mirrors *Florida v. J.L.* in that the tip which led the officers to Defendant lacks sufficient "indicia of reliability," and was not supported by independent police corroboration, to create reasonable suspicion.

This Court rules for the Defendant. As directed by *Nelson*, this Court analyzes the anonymous tips by considering the "totality of the circumstances." *Nelson*, 284 F.3d at 481.

## I. *Government Arguments for Indicia of Reliability*

The Government argues that the specificity of the description in the tip is an indicia of reliability. Specifically, the Government argued five "indicia" at oral argument to support the stop and frisk: (1) the specificity of the tip as to the description of the individual; (2) the officer's prior experience with defendant; (3) the fact that a gun was reported and in New Jersey possession of a gun creates a presumption of illegality; (4) the anonymous call was recorded contemporaneously in a log; and (5) the police responded immediately.

 First, the Government argues that the fact that the tip caused the officers to think of Mr. Crandell immediately sup-

ports the tipster's reliability. In essence, the tip's specificity, insofar as it identified Defendant accurately, lends to its credibility to show knowledge of criminal activity. In *Florida v. J.L.*, the Supreme Court dismissed this argument outright. 529 U.S. at 271–72, 120 S.Ct. 1375.

"An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: it will help the police correctly identify the person whom the tipster means to accuse." *Id.* at 272, 120 S.Ct. 1375. Such a tip fails to show that the tipster has knowledge of "concealed criminal activity," which is at the epicenter of what must be demonstrated. *Id.*

Indeed, the physical descriptions set forth in the tips in this case and in *J.L.* are very similar. In *J.L.*, it was a young, black male wearing a plaid shirt at a bus stop and carrying a gun. Here, the tip provided for a black male, with dreadlocks with blonde tips, wearing a tan shirt and blue jeans while carrying a gun.[10] The anonymous tipster's physical description of Crandell holds no weight in this Court's determination concerning reasonable suspicion.[11]

Further, the Third Circuit has noted, in dicta, that an anonymous tip, which provided descriptive detail of the car from which

---

*Florida v. Bostick*, 501 U.S. 429, 434–35, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)).

*Drayton* is inapposite because the Government essentially asks this Court to ignore the tip. This Court does not dispute the ability of officers to approach individuals in public areas to pose questions and even request consent to search. However, without the anonymous tip, there is no approach—there is no request for consent—and there is no pat down. Accepting the Government's argument would, in effect, undercut the anonymous tip jurisprudence by allowing officers to sidestep the reasonable suspicion requirement by merely asking for consent as they stopped suspects.

10. If anything, the tip in *J.L.* contains more information in that it gave a specific location. Here, the officers were not even provided with a location to which they could respond, excepting Marshall Drive two nights before the tip was made.

11. In *Alabama v. White*, the tipster provided the name of the alleged criminal. The Court did not focus on this aspect of the tip in its discussion of the reliability of that tip. Thus, in this case, even if in the hypothetical situation where the tipster informed dispatch that "Ricky Crandell" has a gun, the personal identification alone does not increase the reliability of the tip. The fundamental issue of the credibility of the tipster remains.

the alleged armed robbery suspects were committing crimes, provided insufficient indicia of reliability. *See Nelson,* 284 F.3d at 482. In *Nelson,* the police department received two tips. The *Nelson* Court reached its holding in that case based on the analysis of the first tip. However, the *Nelson* Court also gave a brief analysis of the second tip, in which an anonymous tipster, calling a general police line from a pay phone, stated that "two black men in a gray BMW with temporary [license] plates were 'riding around sticking up people.'" *Id.* at 475. The Circuit noted that, despite the detailed description of the car, "[t]he second broadcast, standing alone, would not have possessed sufficient indicia of reliability—it was wholly anonymous and received on a generally available telephone line, even though it did originate from a high-crime area and was reporting current criminal activity." *Id.* at 482.

 Next, the Government argues that the officers' knowledge and experience with Crandell supports the stop and frisk. The Government argues that the officers' knowledge of Mr. Crandell's past brushes with the law in some way supports the tip. This is clearly not the type of corroboration that is envisioned by the Supreme Court in *J.L.* This argument seems to circle back to the Government's first argument: that the anonymous caller's ability to identify *a criminal known to the officers* in some way makes the caller's tip more reliable. Again, accurate descriptions of a person, even a former criminal, do not support the tipster's reliability in providing knowledge of criminal activity. Further, this Court does not consider the officers' knowledge of Defendant's criminal activity in the past as corroborative police investigation, sufficient to justify a *Terry* stop.[12]

The Government, however, must argue that prior knowledge of Defendant is corroborative police work because the officers did no other investigative work to corroborate the tip. Nor could they, as the tip did not provide enough information to corroborate anything besides the description. There was no location in the tip to which the officers could respond. The officers admitted that they went to the location where they thought Defendant would be. (T9:19–20) ("we [knew] Mr. Crandell frequents that area a lot").

In fact, Officer Valez did not even attempt to corroborate the physical description. (T51:8) (when questioned as to whether he could see the gold tips under a towel on Defendant's head, Valez stated, "I know his face."). Simply put, the officers heard the tip, thought of Defendant, and went to find him.

 The Government argues further that Defendant's possession of a gun provides, under New Jersey state law, a presumption of illegality. N.J. Stat. Ann. § 2C:39–5(b) (It is a crime in New Jersey to knowingly possess any handgun "without first having obtained a permit to carry [the gun.]"); N.J. Stat. Ann. § 2C:39–2(b) (New Jersey presumes that someone carrying a handgun does not have a permit until the person proves otherwise). The Government is arguing that the subject's alleged possession of a gun is a criminal activity in and of itself, which thereby supports the tip's reliability because the tipster witnessed ongoing "criminal activity." *See Nelson,* 284 F.3d at 482–83 (the Court recognized the importance of the tipster being the victim of a crime and the importance of the tip's information regarding ongoing violent crimes).

---

**12.** More importantly, the officers did not prove or show any true familiarity with Cran-dell's criminal record, merely mentioning it in passing during their testimony.

This argument fails, first and foremost, because it argues for the exact opposite result of one of the key holdings in *J.L. Florida v. J.L.* was, in part, a response to federal Circuit Court decisions which allowed *Terry* stops based solely on tips that a person was carrying a gun. *J.L.*, 529 U.S. at 269, 120 S.Ct. 1375 (citing *United States v. DeBerry*, 76 F.3d 884, 886–87 (7th Cir.1996); *United States v. Clipper*, 973 F.2d 944, 951 (D.C.Cir.1992)). The *J.L.* court rejected flatly all tests, including a "handgun exception," which lowered the standard for reasonable suspicion in the context of an anonymous tip regarding a gun. *Id.* at 271–73, 120 S.Ct. 1375; *supra* pp. 440–41. The Government's argument fails and the fact that gun possession is presumptively illegal in New Jersey adds no degree of reliability to the tip.

Beyond the "handgun exception," the argument also fails because the fact that the caller alleged possession of a gun, which, if true, describes a presumptively illegal activity, "does not mean that the police may make a *Terry* stop without meeting the reliability requirement." *J.L.*, 529 U.S. at 273, 120 S.Ct. 1375.

■ Next, the government argues that the fact that the call was entered in a log contemporaneously increases the reliability of the tip. Justice Kennedy, in his concurrence in *J.L.*, observed that anonymous calls differed slightly from those which have been recorded because officers might be able to use the recording to track down the tipster. *Id.* at 276, 120 S.Ct. 1375 (Kennedy, J. concurring). The added risk, Justice Kennedy opined, would, thereby, add a degree of reliability to the tip.

Without addressing the precedential value of a Supreme Court concurrence, it should be noted that Justice Kennedy was clearly referring to *tape* recordings. Only tape recordings could provide officers with a possible means of tracking down the tipster independent from the information contained in the tip. The tip here was recorded into a police log, which would provide little more than a dry transcript of the conversation.[13] The fact that the tip was recorded adds little, if any, reliability to the tip.

■ Finally, the Government argues that the fact that the officers responded immediately adds to the credibility of the tip. This argument likely stems from a quote from *United States v. Valentine.* "From the fact that the officers acted, and acted quickly, after receiving the tip, a court may deduce that the officers thought the tipster's demeanor, voice, and perhaps a host of other factors supported the reliability of the tip." *Valentine*, 232 F.3d at 355.

In the instant matter, however, the officers that responded to the call did not directly receive the call. They had no means of assessing the caller's reliability, except for the content of the tip. The officers' immediate reaction, while belying their diligence, does nothing to support the credibility of the tipster.

The Government's arguments regarding the indicia of reliability are unpersuasive. The Government can point to no significant difference in the fact patterns which sets this case apart from *J.L.* There is no face-to-face tip, as was the case in *Valentine.* There is no predictive information or

---

13. This Court also disagrees humbly with this section of Justice Kennedy's concurrence. To produce the risk necessary to increase the reliability of the tip, the tipster would have to *know* the call was being recorded and, thereby, know of the possibility that he might be tracked down. It is unlikely that a tipster would ever be sure of this. In any event, the record in this case contains no information as to whether the tipster knew that his call was being recorded.

ongoing violent criminal activity as outlined in *Nelson.*[14] The anonymous tip here is insufficient to support a stop and frisk. The officers did not conduct any corroborative investigation to bolster the tip. The officers did not have a reasonable suspicion to stop Defendant.[15] We now move on to the Government's other arguments.

## II. Government's Comparison to Valentine

The Government also argues that this case compares more closely with *Valentine,* where the Circuit found reasonable suspicion, than with *J.L.* This Court disagrees. The tip in *Valentine* differs in several ways. First, the tip in *Valentine* was automatically more reliable because 1) the tipster was responding to something he had observed very recently and 2) the tip was provided face-to-face. In *Valentine,* the tipster told the officers that he had seen the defendant with a gun only a few seconds before. The officers in this matter did not testify that they knew if the tipster was describing something he had seen very recently, and there is nothing in the record that would lead this Court to believe so.

Arguably, that portion of the log, which states that the "caller stated he can see the impression of the gun in the back of the male's shirt," (Exhibit G–2) could be construed as indicating that the tipster's description was contemporaneous. (Of course, the full record belies this argument.) Even assuming this interpretation, however, the degree to which this aspect increases the reliability of the tip is negligible. Part of the reasoning for the rule against anonymous tips is that the courts wish to avoid putting innocent civilians at risk of embarrassing stops based on the word of an unknown informant. *See J.L.,* 529 U.S. at 272, 120 S.Ct. 1375 (in describing the reasoning against a per se "handgun" or "firearm" exception, the Supreme Court stated "[s]uch an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the target simply by placing [an] anonymous call...."). That the unknown informant alleges that he is seeing illegal activity at the time cannot, alone, justify this stop. To hold that a tip is sufficiently reliable to justify a *Terry* stop because it is given in the present tense would be antithetical to the reasoning behind the entire tip jurisprudence.

The face-to-face nature of the tip in *Valentine* is very significant .because it allows the officers to assess the credibility of the tipster first hand. In *Valentine,* the Court found that the officers likely found reliability in the tip based on the immediacy with which the officers began their search. *Valentine,* 232 F.3d at 355. The tip in this matter was not face-to-face. In fact, the reference to a location of Defendant while in possession of a gun was approximately 24 to 48 hours old. (Exhibit G–2).[16]

---

**14.** As noted in the body of this opinion, the tip in the instant matter contains less indicia of reliability, insofar as it does not allege violent activity and is only arguably contemporaneous, than the second call in *Valentine.* The Third Circuit dismissed that call, which was made from a public phone to a general line, as insufficient, standing alone, to justify a *Terry* stop.

**15.** Indeed, Officer Valez testified that he did not know the difference between probable cause and reasonable suspicion (T55:18–21), and that he "didn't know whether he had the legal right" to stop Defendant, which was why he asked for consent immediately upon stopping Defendant. (T56:15–19).

**16.** The caller did claim to see the gun's impression through the suspect's shirt, but no location was given.

The *Valentine* facts also differ in that Valentine was walking in a high crime area known for shootings at 1 a.m. Valentine also walked away upon seeing the police. Here, Crandell was in a high crime area (according to the officers), but not late at night. Crandell also did not flee upon seeing the officers. Here, Crandell's actions mirror more closely the facts in *J.L.*, where the officers, upon responding, witnessed three black males "just hanging out there." *J.L.*, 529 U.S. at 268, 120 S.Ct. 1375. Aside from the tip, the officers had no reason to suspect the three individuals of any wrongdoing. *Id.* In this case, as well, the officers had no reason, aside from the tip, to suspect Crandell of any illegal conduct. Crandell was walking on a public street and carrying groceries.

Further, the *Valentine* decision also takes into account Valentine's flight after the officers asked him to stop. While Defendant fled in this matter, he did not flee until after he had been illegally stopped.

In sum, the present matter falls more squarely into the *J.L.* fact pattern than it does in the *Valentine* pattern. This matter lacks any of the significant indicia of reliability relied on in *Valentine*.

### III. *Unreasonable Expectation Argument*

The Government argues that to find the stop and frisk unconstitutional places similarly situated officers in an unreasonable position—they "know" there is a gun, but cannot act. At oral argument, the Government inquired of this Court "[w]hat were the officers to do? Were they to not approach him or were they to ignore the fact that he fit the description?" (T107:12–14). The answer is, simply, that it is not the province of this Court to determine how the police could have better performed their jobs. This Court's function is to examine the applicable Supreme Court and Third Circuit precedent, and apply that precedent to the facts before it. In this case, the facts do not support a *Terry* stop.

This Court would take the first step down a very slippery slope if it allowed an anonymous call, accusing an individual of criminal activity without location or any predictive information, to justify a stop. A simple phone call "would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search ... simply by placing an anonymous call...." *J.L.*, 529 U.S. at 272, 120 S.Ct. 1375 (J. Ginsberg, describing the unpleasant possibilities in the event that the Supreme Court endorsed a gun exception for anonymous tips).

More importantly, by allowing such a call, this Court would be lending its imprimatur to officers, who upon hearing a description, e.g., a black male, wearing a Yankees hat and jeans, to circumvent information, or the lack thereof, on the malfeasor's location, and merely say, in response, "that description fits Joe Sunshine, let's go pick him up." In this circumstance, surely the Constitution, and more specifically the Fourth Amendment, would have little force.

### IV. *Consent*

The Government also argues that Defendant gave his consent to the search, which, in effect, bypasses the anonymous tip laws. In essence, the Government argues that, looking at the totality of the circumstances, the fact that Defendant gave consent for the search rectifies the illegality of the stop. This argument is incorrect.

■■ To admit evidence obtained in a consent search, the Government must not only "show that consent is voluntary in fact, but it must also demonstrate a break in the causal connection between the illegality and the consent [such that] the con-

sent was 'sufficiently an act of free will to purge the primary taint.'" *United States v. Melendez–Garcia,* 28 F.3d 1046, 1054 (10th Cir.1994) (citing *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). To determine whether the taint is purged when an illegal detention or stop precedes consent to search, courts must look to "the temporal proximity of the illegal detention and the consent, any intervening circumstances, and the purpose and flagrancy of the officer's unlawful conduct." *United States v. Holt,* 264 F.3d 1215, 1236 (10th Cir.2001) (citing *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).

■ Here, assuming that Defendant actually consented to the search, the consent came immediately on the heels of his stop, which, as set forth above, was illegal because it was based solely on an anonymous tip. In the accounts of both officers, the consent was given simultaneously with the stop. The stop, search, and consent occurred essentially as one event. There were no intervening circumstances which might support the consent. Thus, the first two considerations weigh in favor of a tainted consent. The last consideration, the purpose and flagrancy of the misconduct, does not shift the analysis. The officers do not appear to have violated the law purposefully by stopping Defendant. Nonetheless, the stop was improper.

Thus, even in the event that Defendant consented to a search, that consent is tainted by the illegality of the stop, which was conducted simultaneously. This argument against suppression is unavailing.

### CONCLUSION

For the reasons stated above, Defendant's motion to suppress evidence seized after falling from Defendant's person on Jackson Street in Hoboken, New Jersey is granted.