

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-29-2009

# USA v. Crandell

Precedential or Non-Precedential: Precedential

Docket No. 07-4004

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"USA v. Crandell" (2009). *2009 Decisions*. Paper 1949.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1949

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 07-4004

UNITED STATES OF AMERICA

Appellant

v.

RONALD CRANDELL
a/k/a Ricky Crandell

Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal Action No. 06-cr-00232)
District Judge: Honorable Joseph A. Greenaway

Argued September 25, 2008

Before: BARRY, AMBRO, and JORDAN, <u>Circuit Judges</u>

(Opinion filed:  January 29, 2009)

Christopher J. Christie
   United States Attorney
George S. Leone
   Chief, Appeals Division
Caroline A. Sadlowski (Argued)
   Assistant U.S. Attorney
Office of United States Attorney
970 Broad Street, Room 700
Newark, NJ   07102-0000

      Counsel for Appellant

Richard Coughlin
   Federal Public Defender
Lisa M. Mack, Esquire (Argued)
Louise Arkel, Esquire
Office of Federal Public Defender, 4th Floor
972 Broad Street
Newark, NJ   07102-0000

      Counsel for Appellee

---

OPINION  OF  THE  COURT

---

AMBRO, <u>Circuit Judge</u>

Three police officers were on routine patrol in a Hoboken, New Jersey housing project when they received an anonymous tip that a male with dreadlocks and blonde hair tips was seen carrying a handgun somewhere in the area.  The officers immediately believed the description of the suspect matched the defendant, Ronald "Ricky"

2

Crandell, whom they recognized for his distinctive appearance and rap sheet. While searching for Crandell in the neighborhood, the officers spotted him walking toward them. They approached him, which led to a pat-down and the recovery of a gun.

A federal grand jury indicted Crandell for possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1). Prior to trial, he moved to suppress evidence of the handgun as the fruit of an illegal Fourth Amendment seizure. The District Court held a suppression hearing. In a comprehensive opinion, the Court presumed a seizure based on the anonymous tip, and granted the motion to suppress.

The Government appeals that ruling.[1] It argues that Crandell was not seized within the meaning of the Fourth Amendment; rather, based on all the circumstances, the encounter was consensual.

We agree that the threshold question of whether Crandell was seized by the officers must be determined by evaluating all the circumstances surrounding the encounter, as a presumption does not suffice in this case. In so concluding, we explore why the tip, which raised the officers' suspicion and led to the encounter with Crandell, does not affect the initial seizure inquiry. We thus remand for further proceedings.

I.      Facts

A.      The Anonymous Tip

---

[1]We have appellate jurisdiction under 18 U.S.C. § 3731.

On July 15, 2005, three Hoboken Police Department officers—Arbend Drishti, Angel Valez, and Jimmy Miller—were on routine foot patrol in a residential area known as the Hoboken Housing Authority. Officer Drishti received an anonymous and uncorroborated tip from the police dispatch center about an armed man seen somewhere in the Housing Authority.[2] The police report described "a black male with dread locks and blonde tips[,] wearing a tan shirt and blue jeans[,] in possession of a handgun on his waistband (small of his back)." Based on this description, Officers Drishti and Valez immediately believed the armed man was Crandell. Officer Valez recognized Crandell's distinctive description because Valez had seen Crandell's picture on numerous occasions in roll call and knew that he had been arrested several times in the area the officers patrolled. After receiving the dispatch, the three officers went to the intersection of Fifth and Jackson Streets in Hoboken to search for Crandell because it is a "high crime area" that he "frequents." However, they did not see him at that location.

## B.     The Encounter with Police

The officers walked south from the intersection, crossing Jackson Street toward Fourth Street. "Approximately halfway between Fourth Street and Fifth Street, [they] saw [Crandell] walking toward them."[3] *United States v. Crandell*, 509 F. Supp. 2d 435, 439

---

[2]Officer Drishti described the Housing Authority as approximately twenty buildings located in an area that measures four blocks by two blocks.

[3]When approaching Crandell, Officer Valez observed that he was wearing "loose jeans" and a "tan shirt." Valez was unsure

(D.N.J. 2007). Crandell did not react when he saw the three uniformed officers and kept walking in their direction. The officers approached Crandell in either a semi-circle or line formation and Officer Valez spoke to him.

The District Court notes that the testimony of Officers Drishti and Valez differs slightly with regard to what the officers said prior to patting Crandell down. *Id.* at 440. Both accounts, however, indicate Valez spoke to Crandell before he began the pat-down. Officer Valez testified:

> As [Crandell] walked toward[] us, I stopped him . . . . and I told him I received information that [he] might have a weapon on [him] and I wanted to give [him] a pat down for our protection[.] I told [Crandell] he was free to leave at any time. . . . [Then Crandell] put his arms up . . . . [and,] as I was patting [Crandell] down, he hit my arm, he turned around and he ran [and] the weapon fell from the back of his pants.

Officer Drishti testified:

> Officer Valez said to [Crandell], is it all right if we pat you down for our safety? You can leave at any time. And [Crandell] said, yeah, what's this all about? He started to get towards the fence[;] there

---

whether he could see Crandell's dreadlocks beneath the towel on his head, but was nonetheless confident it was Crandell because "[I] know his face."

was a fence there. I was on . . . Officer Valez's left, Officer Miller was on his right, and as he was picking up to put his hand like toward[] the fence, he was asking, what's this all about? And Officer Valez said, we got a call you might have a handgun on you. At that moment, as Officer Valez started to try to pat him down, he may have touched him once or twice, as soon as he got like towards the back area, Mr. Crandell turned abruptly and like knocked [Officer Valez's] arm to the side and a handgun flew from the lower back area onto the sidewalk, and Mr. Crandell then proceeded to run south on Jackson . . . .

According to Drishti (obviously speaking with at least some overstatement), the whole event took "a couple of seconds." Officer Miller recovered the gun while Officers Drishti and Valez chased Crandell, but were unable to catch him at that time. Thereafter, a warrant was issued and Crandell was arrested.

## C. The Suppression Hearing

After a federal grand jury indicted Crandell for possessing a firearm as a convicted felon, he moved to suppress evidence of the handgun as the fruit of an illegal Fourth Amendment seizure. The District Court held a hearing and granted his motion to suppress, in effect dismissing the charge against him. The Court ruled that the seizure was illegal because the anonymous tip did not provide the officers with reasonable suspicion to justify the stop. *Id.* at 437. In so ruling, it presumed Crandell was seized at the outset of the encounter, as the officers' suspicion stemming from the tip tainted the possibility of consensual interaction. *Id.* at 446–47 n.9. The

6

Government appeals that ruling.

## II.     Discussion

We review a district court's grant of "the motion to suppress for clear error as to the underlying facts, but exercise[] plenary review as to its legality in light of the court's properly found facts." *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003) (citation and internal quotations omitted) (alteration in original).

### A.     Was Crandell Seized?

The Fourth Amendment protects individuals from "unreasonable searches and seizures" of "their persons, houses, papers, and effects." U.S. Const. amend. IV. Because of the Amendment's language, we generally use the phrase "search and seizure" when evaluating the Fourth Amendment issues involved in suppression cases. But in certain circumstances, such as this, our legal analysis is flipped; we begin with whether an individual was seized, and, if so, whether it was valid, then the search analysis follows.

The Fourth Amendment generally requires that police officers obtain a warrant based on probable cause to justify a seizure and search. *Terry v. Ohio*, 392 U.S. 1, 20 (1968). *Terry* held, however, that Fourth Amendment seizures can be legal absent a warrant in certain circumstances, which may include brief investigative detentions. *Id.* at 20 (describing beat cops' encounters with citizens "predicated upon . . . on-the-spot observations" as an example of conduct that would not require a warrant).

A warrantless Fourth Amendment seizure needs an objective and particularized justification. *United States v. Mendenhall*, 446 U.S. 544, 551 (1980). Under *Terry*, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "Reasonable suspicion [required for a *Terry* stop] is a less demanding standard than probable cause [necessary for an arrest] and requires a showing considerably less than preponderance of the evidence. . . . [R]easonable suspicion can arise from information that is less reliable than that required to show probable cause." *United States v. Valentine*, 232 F.3d 350, 353 (3d Cir. 2000) (citations and internal quotations omitted).

The first analytical step a court takes to evaluate the issues involved in this type of motion to suppress is to determine whether and when a citizen-police encounter implicates the Fourth Amendment. "Before even addressing whether the police had reasonable suspicion to approach [and engage an individual], the District Court [must first inquire] into whether [the individual was] 'seized' by the police" within the meaning of the Fourth Amendment. *United States v. Williams*, 413 F.3d 347, 352 (3d Cir. 2005). Courts regularly grapple with whether a particular encounter "amount[s] to a 'seizure'" of a person or "intrudes upon no constitutionally protected interest." *Mendenhall*, 446 U.S. at 552–53. Street encounters between citizens and police officers, like the encounter in this case, "are incredibly rich in diversity," and "[o]bviously[] not all personal intercourse between policemen and citizens involves 'seizures' of persons'" implicating the Fourth Amendment. *Terry*, 392 U.S. at 13, 19–20 n.16.

8

The Supreme Court has made clear that a Fourth Amendment "seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). These encounters of short duration that do not amount to Fourth Amendment seizures can be characterized as "consensual" because the citizen has the ability to engage in or terminate the encounter. *See United States v. Wilson*, 413 F.3d 382, 386–87 (3d Cir. 2005) (determining whether the further questioning by the police officer after issuing a traffic citation was a consensual encounter or a Fourth Amendment seizure). "When an encounter is consensual, no reasonable suspicion is required." *United States v. Kim*, 27 F.3d 947, 950 (3d Cir. 1994).

A seizure occurs only "when [a police officer], by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry*, 392 U.S. at 19–20 n.16; *see also Curley v. Klem*, 298 F.3d 271, 279 (3d Cir. 2002) (a "seizure occurs [w]henever an officer restrains the freedom of a person to walk away" (citations and internal quotations omitted) (alteration in original)). The "show of authority" test "is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person" in light of all the surrounding circumstances. *California v. Hodari D.*, 499 U.S. 621, 628 (1991) (citing *Mendenhall*, 446 U.S. at 554) (stating that the individual must submit to a show of authority to effect a seizure). The Supreme Court cited several circumstances in *Mendenhall* that might indicate a seizure, even where the person did not attempt to leave, including

> the threatening presence of several officers, the
> display of a weapon by an officer, some physical

9

touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

446 U.S. at 554–55 (internal citations omitted).

The label a court ultimately attaches to an encounter is more than a legal abstraction of police conduct. In the evidentiary context of the defendant's criminal trial, it can affect "the admissibility against [a defendant] of the evidence uncovered by the search and seizure." *Terry*, 392 U.S. at 12 (referred to as the "exclusionary rule"). In situations like Crandell's—where the criminal charge rests solely on the physical evidence that is the subject of a motion to suppress—a ruling in the defendant's favor results in dismissing the entire case against him.

The basis of the District Court's ruling to suppress the handgun here was its initial presumption that the officers seized Crandell within the meaning of the Fourth Amendment. In presuming that a Fourth Amendment seizure occurred, the Court did not evaluate the facts and circumstances surrounding the encounter, but instead reasoned that the anonymous tip tainted the approach and negated the possibility of consensual interaction between the police officers and Crandell. *Crandell*, 509 F. Supp. 2d at 446–47 n.9 ("Accepting the Government's argument would, in effect, undercut the anonymous tip jurisprudence by allowing officers to sidestep the reasonable suspicion requirement by merely asking for consent as

they stopped suspects."). The Court then examined our anonymous tip case law in-depth to conclude that the officers did not have "reasonable suspicion," as *Terry* requires, to stop Crandell legally. *Id.* at 437–51.

Our path differs from that of the District Court. We believe it should have considered whether the encounter was consensual at the outset instead of presuming that the police seized Crandell. The Supreme Court requires us to evaluate all the objective circumstances surrounding the encounter from the perspective of the "reasonable" person who is the recipient of the police attention. *See Bostick*, 501 U.S. at 438 (stating the "Fourth Amendment inquiry [is] whether a reasonable person would have felt free to decline the officers' requests or otherwise terminate the encounter"). The subjective intent underlying an officer's approach does not affect the seizure analysis. As noted above, a seizure does not occur simply because an officer approaches an individual—and gun owners are no exception—to ask questions. *Valentine*, 232 F.3d at 356 (citing *Bostick*, 501 U.S. at 434); *see also Williams*, 413 F.3d at 353–54. Therefore, a tip police received that motivates their encounter with an individual merely serves to color the backstory at this stage.

The Supreme Court considered a related question in *United States v. Drayton*, 536 U.S. 194 (2002). It dealt with a citizen-police encounter in the more restrictive confines of a bus. Three officers boarded a Greyhound bus to conduct routine drug interdiction efforts. *Id.* at 197. When they approached Drayton to question and request consent to search him, they were suspicious that he had drugs on him. *Id.* at 198–99. The officers had just searched and arrested his traveling companion and seatmate, Brown, for carrying concealed narcotics. *Id.* After arresting Brown, they focused their attention on

11

Drayton. In analyzing whether the officers' encounter with Drayton was consensual, the Court reiterated *Bostick*'s holding that police need not have any suspicion of wrongdoing to approach and request consent to search an individual. *Id.* at 201 (citing *Bostick*, 501 U.S. at 434–35). The Court acknowledged that the officers were suspicious of Drayton even before they questioned and requested consent to search him, yet it concluded that Drayton's encounter was consensual and he was not seized by police. It reasoned:

> It would be a paradox, and one most puzzling to law enforcement officials and courts alike, were we to say, after holding that Brown's consent was voluntary [without the police having any suspicion of wrongdoing], that Drayton's consent was ineffectual simply because the police at that point had more compelling grounds to detain him.

*Id.* at 207–08. Moreover, "[t]he fact the officers may have had reasonable suspicion does not prevent them from relying on a citizen's consent to the search." *Id.* at 207. Indeed, "'consensual encounters are important tools of law enforcement,'" particularly in situations where officers are unsure whether they have the legal authority to detain a suspect forcibly. *Williams*, 413 F.3d at 352 (quoting *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003)).

The Government suggests we should conclude that Crandell's encounter with the police was consensual because any findings of fact to the contrary would be clearly erroneous. It thus requests that we reverse the District Court's order granting the motion to suppress, rather than vacate it and remand. We decline. The District Court's role is to find facts and determine in the first instance whether

12

Crandell was seized within the meaning of the Fourth Amendment under the totality of the circumstances. *See Bostick*, 501 U.S. at 437.

We note, however, that the Supreme Court's analysis in *Drayton* provides a framework for the District Court to bear in mind when evaluating this issue. Though the police encounter there occurred on a bus, the Court concluded that under all the circumstances Drayton was not seized because "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice."[4] *Drayton*, 536 U.S. at 204. The Court also noted that "[i]t is beyond question that had this encounter occurred on the street, it would be

---

[4]In evaluating this issue, the District Court should also take into consideration what the Supreme Court found was not coercive in *Drayton*. For example, at the suppression hearing the District Court seemed inclined to conclude that the mere presence of three police officers was sufficient to render the encounter a seizure. *See* Appellant's App. V.II 66 (quoting the District Court (hearing transcript): "you have three officers approach you, and it would appear, I think, to the objective observer, that the statement 'you're free to go' was merely perfunctory"). *Drayton* also involved three officers. 536 U.S. at 197. The officers boarded the bus to question passengers and conduct narcotics searches, and one of the officers positioned himself next to the exit at the front of the bus. Yet the Supreme Court did not find the mere presence of three officers coercive. *Id*. at 203–05. With this note, we leave to the District Court in the first instance the marshaling of evidence and weighing of all the circumstances pertinent to the seizure issue.

constitutional." *Id.* (indicating the setting, such as a bus, was one factor, but not determinative). Furthermore,

> the fact that in [an officer's] experience only a few passengers have refused to cooperate does not suggest that a reasonable person would not feel free to terminate the [] encounter. . . . "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response."[5]

*Id.* at 205 (quoting *INS v. Delgado*, 466 U.S. 210, 216 (1984)).

If the District Court determines that, under all the circumstances, Crandell was seized by the officers when they approached him, then reasonable suspicion to conduct a *Terry* stop must exist. At this stage, the Court in normal course would consider the significance of the anonymous tip in providing a basis for reasonable suspicion.

This normal course does not apply here, however. The Government opted not to appeal the District Court's ruling that the anonymous tip did not provide the officers with a basis for reasonable suspicion to stop and frisk Crandell. *Crandell*, 509 F. Supp. 2d

---

[5]At the suppression hearing, one of the officers testified that he "has never had anybody say, well, thank you, officer, I choose to walk away." As the Supreme Court discussed, this type of statement does not affect whether Crandell was free to go.

at 447–51.  It thereby concedes that the officers' basis for suspicion did not rise to the constitutionally required standard of "reasonable suspicion" to validate a *Terry* stop.  Without reasonable suspicion, the seizure of Crandell would be illegal and the gun obtained in connection with the ensuing pat-down search would properly be suppressed under the metaphorical "fruit of the poisonous tree" doctrine.  *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963).  In such a circumstance, even if Crandell consented to the pat-down search, his "search consent" would be overborne by the unconstitutional stop.  *See id.*

Thus, this case pivots on whether Crandell was seized.  Only if he was not seized within the meaning of the Fourth Amendment would the District Court proceed to the search inquiry set out below.

**B.** **Assuming Crandell was not seized, was the search of him consensual?**

If the District Court determines that Crandell was not seized during his encounter with police, then the Court must evaluate whether he voluntarily consented to the pat-down search for weapons.[6]  "'[A] search conducted pursuant to consent is one of the

---

[6]*Wilson* is an example of an encounter where we considered a citizen's consent to search.  413 F.3d at 388.  We first determined "that no seizure occurred, *i.e.*, that Wilson's continued encounter with [the officer] was consensual," and thus we did not need to reach Wilson's argument that the officer did not have reasonable suspicion to justify the questioning.  *Id.* at 388 n.6.  We next evaluated whether Wilson's consent to the search of his bag was voluntary.  *Id.* at 388 (concluding that

15

specifically established exceptions to the warrant requirement.'" *Wilson*, 413 F.3d at 388 (alteration in original) (quoting *Givan*, 320 F.3d at 459).[7]

Consent to a search is determined by examining all the circumstances, similar to the inquiry of whether a seizure occurred. *Givan*, 320 F.3d at 459. If the initiation of the encounter and the pat-down search are close in time, as they are here, then the respective consent analyses of the seizure and search will turn on similar facts. *See Drayton*, 536 U.S. at 206. "'[T]he critical factors comprising a

---

Wilson gave his voluntary consent to the search and thus there was no Fourth Amendment violation).

[7]An officer must place his hands on an individual to conduct a pat-down search, which leads logically to the contention that this act constitutes a seizure. *Mendenhall* dealt with this conflation of seizure and search by explaining that in *Terry*

> [o]bviously the officer "seized" Terry and subjected him to a "search" when he took hold of him . . . and patted down the outer surfaces of his clothing. What was not determined in that case, however, was that a seizure had taken place before the officer physically restrained Terry for purposes of searching his person for weapons. The Court "assume[d] that up to that point no intrusion upon constitutionally protected rights had occurred."

446 U.S. at 552–53 (internal citations omitted).

16

totality of the circumstances inquiry include the setting in which the [search] consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting [party].'" *Wilson*, 413 F.3d at 388 (quoting *Givan*, 320 F.3d at 459). This consent inquiry does not require officers to inform citizens of their right not to cooperate when "seeking permission to conduct a warrantless consent search." *Drayton*, 536 U.S. at 206 (citations omitted); *id.* at 207 (stating no "extra weight" should be given "to the absence of this type of warning").

## CONCLUSION

The District Court needs to determine on remand whether the officers' encounter with Crandell was consensual or constituted a Fourth Amendment seizure, as this will determine whether it needs to proceed to the remaining suppression issue. We thus vacate its ruling that granted the motion to suppress and remand this case for further proceedings consistent with this opinion.