PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-3472
_____

UNITED STATES OF AMERICA,
                                    Appellant

v.

ABDULRASHEED YUSUF
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-18-cr-00042-001)
District Judge:  Hon. Katharine S. Hayden
_____

Argued
September 23, 2020
_____

Nos. 19-3697/3800
_____

UNITED STATES OF AMERICA,
                                    Appellant in 19-3697

v.

STEVEN CAMPBELL,

                    Appellant in 19-3800

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-18-cr-00354-001)
District Judge: Hon. Anne E. Thompson

_____

Argued
September 23, 2020

Before:   SMITH, *Chief Judge*, McKEE, and JORDAN,
*Circuit Judges.*

(Filed: April 2, 2021)

_____

David B. Glazer   [ARGUED]
Glazer & Luciano
19-21 West Mount Pleasant Avenue
Livingston, NJ 07039
     *Counsel for Abdulrasheed Yusuf*

James R. Murphy   [ARGUED]
947 State Road – Suite 205
Princeton, NJ 08540
     *Counsel for Steven Campbell*

Mark E. Coyne
Richard J. Ramsay   [ARGUED]
Office of United States Attorney
970 Broad Street – Room 700
Newark, NJ 07102
	*Counsel for the United States of America*

———————————

OPINION OF THE COURT

———————————

JORDAN, *Circuit Judge*.

In these consolidated appeals, the government challenges the sentences given to Steven Campbell and Abdulrasheed Yusuf, both of whom pled guilty to their respective crimes. As part of their plea agreements, Campbell and Yusuf each agreed not to argue for a sentence outside the range recommended by the United States Sentencing Guidelines. The government contends that both defendants breached their plea agreements by in fact seeking sentences below the guidelines-recommended ranges.

Although the facts of these two cases provide a useful contrast, ultimately, we conclude that the government's contentions are well founded in both. Accordingly, we will vacate Campbell's and Yusuf's sentences and remand for resentencing.

Campbell also cross-appeals, arguing that evidence discovered during the traffic stop leading to his arrest should have been suppressed because the stop violated the Fourth Amendment. The District Court rejected his arguments,

holding that the police officer involved was justified in stopping Campbell's vehicle and did not impermissibly extend the duration of the stop. Because we agree that the traffic stop was conducted within the bounds of the Fourth Amendment, we will affirm the order denying suppression.

## I.   BACKGROUND

### A.   Federal Sentencing

As context for the case histories that follow, we briefly note the legal framework that governs sentencing. Federal courts follow a well-established three-step process to determine the sentence in any given case. *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2011). First, the court calculates the defendant's non-binding sentencing range as provided by the sentencing guidelines. *Id.* The range is a function of the defendant's offense level and his criminal history points, which are respectively determined by the particular facts of the case and the defendant's past behavior, all as viewed through the substantive rules set forth in the guidelines. *See Guidelines Manual 2018*, United States Sentencing Commission, https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/2018/GLMFull.pdf. Second, the court considers whether one or more departure provisions of the guidelines are applicable, warranting a sentence outside of the ordinarily recommended range. *See Gunter*, 462 F.3d at 247. Finally, the court looks to the sentencing factors listed in 18 U.S.C.

4

§ 3553(a),[1] to determine whether, as a matter of discretion, a variance from the recommended range is appropriate.[2] *Id.*

With that framework in mind, we turn to the details of the cases before us.

---

[1] The seven factors a court must consider under § 3553(a) are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the four primary purposes of sentencing, i.e., retribution, deterrence, incapacitation, and rehabilitation; (3) the kinds of sentences available (e.g., whether probation is prohibited or a mandatory minimum term of imprisonment is required by statute); (4) the sentencing range established through application of the sentencing guidelines and the types of sentences available under the guidelines; (5) any relevant "policy statements" promulgated by the Commission; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

[2] A "variance" is a sentence that deviates from the guidelines range based on the § 3553(a) sentencing factors. A "departure," on the other hand, is a sentence that differs from the guidelines range based on specific guidelines provisions that authorize such changes. *United States v. Gunter*, 462 F.3d 237, 247 n.10 (3d Cir. 2006) (citation omitted).

### B.    Steven Campbell

Campbell was arrested following a traffic stop when it was discovered that he was unlawfully in possession of firearms.  He had been driving home from work, when a police officer pulled behind him at a stop light and noticed that his license plate was partially obstructed.  The officer checked the number on the plate against a law enforcement database and saw that Campbell, who was listed as the owner of the car, had had his license suspended the month before.  When the light turned green and Campbell turned the corner, the officer verified that Campbell was driving the car from the photograph on record.

The officer then pulled Campbell over and asked for his license, registration, and insurance card.  As Campbell began searching for his registration and insurance card, he unintentionally revealed a handgun in the center console.  The officer thought he saw a gun but "wasn't 100 percent sure at that point[.]"  (JA at 108.)  When Campbell produced his insurance card, the officer saw that it was expired.  Campbell next produced his vehicle registration.  He then continued looking for an up-to-date insurance card, and the officer suggested he look in the center console.  While Campbell was searching the center console a second time, the officer saw the gun more clearly.  Campbell also opened the glove box, and the officer observed a second gun there.  Upon seeing the second gun, the officer drew his firearm and asked Campbell to put his hands on the steering wheel.  At that point, the officer placed Campbell under arrest.  Up to that point, the stop had lasted approximately five minutes.

6

Campbell as a convicted felon was prohibited from possessing guns. He was indicted under 18 U.S.C. § 922(g) for possessing the two guns and ammunition. He filed a motion to suppress, arguing that the officer lacked probable cause for a search and arrest. The government opposed that motion, and, following a suppression hearing, the District Court denied it.

Campbell ultimately entered into a plea agreement which included a limited right of appeal, permitting him to seek review of the suppression ruling. The agreement also noted that Campbell and the government agreed "that the United States Sentencing Guidelines are not binding upon the Court[,]" but "that the Court should sentence Campbell within the Guidelines range that results from the total Guidelines offense level" specified in the agreement. (JA at 199.) In addition, "[t]he parties agree[d] not to seek or argue for any upward or downward departure, adjustment or variance" and "that a sentence within the Guidelines range that results from the agreed … offense level is reasonable." (JA at 199.) The parties agreed that the guidelines offense level was 18, resulting in a guidelines range of 30 to 37 months of imprisonment.[3]

---

[3] The Presentence Investigation Report from the U.S. Probation Office concluded that Campbell's criminal history score was three, resulting in a category II criminal history designation. Although not expressly agreed to in the plea agreement, the parties did not dispute that designation, and it is the one that, when combined with an offense level of 18, yields a range of 30 to 37 months on the guidelines sentencing table.

Despite the agreement not to seek a departure or variance, when Campbell's counsel filed a sentencing memorandum, he reminded the District Court of its discretion to look beyond the guidelines. He closed the memorandum by saying, "the only question left to answer is does one treat Steven Campbell by the calculated Guideline formula or by an appreciation of the person [] he has become." (JA at 221-23.) The sentencing memorandum also included letters of support asking for leniency in sentencing, some plainly asking for a non-custodial sentence. The government did not object to those statements in its subsequent sentencing memorandum and said instead that, "[i]n accordance with the terms of the plea agreement, Campbell has not sought a variance[.]" (JA at 268.)

At the sentencing hearing, Campbell's counsel again emphasized the importance of the § 3553(a) factors, saying he did so "despite whatever the plea agreement says between the Government and my client and I [sic.]" (JA at 280.) He also described the guidelines range as "the starting point obviously … and that's just it, a starting point." (JA at 280.) When he had a chance to put Campbell himself on record, counsel asked what Campbell thought a just punishment would be for his offense, and Campbell, addressing the Court, said, "I would hope Your Honor would consider probation, house arrest, community service, anything other than jail time." (JA at 287.)

The government objected to that statement, based on the plea agreement. Campbell's attorney said, "[w]e stand by the plea agreement[,]" and he claimed he had "not raised any issue as to the guideline range[,]" but he again emphasized that the District Court "has the right to make the decision as to what sentence my client receives." (JA at 288.) The District Court

8

responded by noting that "this is probably not the case" where such comments are "appropriate[,]" but it let the defense continue presenting testimony and argument. (JA at 288-89.) When he continued, Campbell's attorney asked Campbell why the judge "should give [him] a break?" (JA at 289.) Campbell responded that "jail will [have] a totally negative effect on everything I have tried to do in recent years." (JA at 289.) Campbell went on to ask the Court to "grant [him] any punishment, except for jail time[.]" (JA at 290.)

When Campbell and his attorney finished their presentation, the government again objected, this time pointing to defense counsel's question about "a break" and Campbell's final plea for any sentence other than jail. (JA at 291-92.) Without speaking further on the government's objection, the District Court sentenced Campbell to a term of imprisonment of one year and a day, followed by three years of supervised release, the time in prison being roughly a third of the time called for by the sentencing range which Campbell had agreed not to contest. In explaining the sentence, the District Court noted the efforts Campbell had made to turn his life around following earlier offenses and then observed that "the tenuous and perhaps fragile hold a person, a former offender, has on rehabilitation can be toppled … perhaps easily." (JA at 300.)

## C.     Abdulrasheed Yusuf

In August 2017, Yusuf participated in a scheme to steal money from accounts at various financial institutions. His co-conspirators would impersonate account holders and withdraw or transfer funds. Yusuf's role was to pick up and deposit the resulting checks in co-conspirators' bank accounts using fraudulent identification. When Yusuf was arrested, he had in

9

his possession the driver's license of someone he intended to impersonate, as well as the license of another individual whom he had impersonated in the past.

Yusuf pled guilty to a two-count information charging him, in Count 1, with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, and, in Count 2, with aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1). The plea agreement included a provision stating, "that neither [Yusuf nor the U.S. Attorney's Office] will argue for the imposition of a sentence outside the Guidelines range that results from the agreed total Guidelines offense level." (JA at 333.) In addition, "[t]he parties agree not to seek or argue for any upward or downward departure, adjustment or variance not set forth herein." (JA at 334.) The U.S. Attorney's office was also careful to ensure that it reserved the right to respond to questions from the court, correct misinformation provided to the court, and provide the sentencing judge with all information relevant to sentencing. The plea agreement further recognized that, notwithstanding its provisions, the "sentencing judge may impose any reasonable sentence" (JA at 327) and that "[t]his agreement … cannot and does not bind the sentencing judge, who may make independent factual findings and may reject any or all of the stipulations entered into by the parties." (JA at 328.)

Yusuf ended up being sentenced twice, and, for reasons not apparent in the record, he was sentenced by a different judge than was his co-conspirator Temilade Adekunle, who was charged with and convicted of the same crimes, based on essentially the same conduct. At Yusuf's first sentencing, the District Court granted a downward variance, imposing a sentence of three months on Count 1 (the wire fraud

10

conspiracy) and a mandatory 24 months on Count 2 (the aggravated identity theft). *United States v. Yusuf*, 781 F. App'x 77, 79 (3d Cir. 2019). We vacated that sentence because the District Court impermissibly considered the mandatory 24-month sentence under Count 2 when calculating the appropriate sentence on Count 1. *Id.* at 80-81. The case was thus remanded for resentencing.

By the time Yusuf appeared for resentencing, his co-conspirator Adekunle had already been sentenced to 26 months for the same two crimes. At Yusuf's resentencing, defense counsel began by saying that he was "to some degree, governed by the plea agreement in this matter, and the reasonableness of the range per the plea agreement[,]" but he nevertheless went on to say that the co-conspirator's sentence "is something that we can't close our eyes to." (JA at 427.) He said that Yusuf and Adekunle were "involved in the same incident, culpable for the same conduct, essentially" but that the government's recommended minimum sentence of 21 months for Count 1 was "ten times the amount of time" the co-defendant was sentenced to. (JA at 429-30.) He also said that the time Yusuf had already served – five months – was "two and a half times more than the time that Mr. Adekunle got." (JA at 429.) He concluded that he "just [didn't] see how we can all stand here and say, well, that somehow is a way, you know, the way this rolls out." (JA at 430.)

The District Court responded that defense counsel's statement was "not only the one that most benefits your client, but also one that makes perfect commonsense because we do have … the anomaly of two low level folks who clearly are a part, and the government has told me they are a part of" the same conspiracy. (JA at 430.) She then asked the government

to provide more information about the conspiracy, which it did. The government agreed that Adekunle had played a comparable role in the conspiracy as had Yusuf, but it noted that the difference between the two defendants was their criminal history categories: Yusuf had a criminal history category of three, and Adekunle had a criminal history category of one. The District Court then noted some concern that Adekunle's sentence had been influenced by Yusuf's original sentence which had since been overturned.

When the Assistant U.S. Attorney was asked about the proportionality of the sentences given to Adekunle and Yusuf, he began by saying, "for the record … the government believes defense counsel has clearly breached the plea. He is not allowed to argue for a departure or a variance." (JA at 438.) The Court disagreed, saying, "He is arguing proportionality. [Defense counsel] is way too smart to walk into that trap. He is doing everything but. And I am almost forcing him to do it. It is fair for him to argue proportionality . . . . [s]o I don't find he's breached the agreement." (JA at 439.)

The District Court then engaged in an extended colloquy with Yusuf about his post-conviction conduct. While in prison, Yusuf had participated in substance abuse classes, including attending additional classes even after he received his certificate of completion, and was more than two years sober.

In imposing its sentence for Count 1, the District Court began by noting that much of Yusuf's criminal history was driven by crimes related to alcohol abuse. She then departed from the guidelines calculation in the presentence report and the plea agreement by lowering Yusuf's criminal history

category to two, with a total offense level of 14, resulting in a sentencing range of 18 to 24 months. In addition to making that adjustment, the District Court said, "I believe a variance is warranted … based upon the post-conviction conduct that Mr. Yusuf has described[.]" (JA at 465.) The District Court then imposed a total sentence of 30 months – six months for Count 1, plus the mandatory 24 months on Count 2 – with six months of home detention and three years of supervised release. The government contemporaneously objected to the sentence on several bases, including the District Court's "determination that defense counsel did not breach the plea agreement." (JA at 477.)

The government timely appealed both cases and asked that they be consolidated.

## II. DISCUSSION[4]

### A. Breach of Plea Agreements[5]

According to the government, Campbell and Yusuf breached their plea agreements by arguing for sentences that were not within their respective guidelines ranges. Again, central to this common issue are the provisions in the plea

---

[4] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

[5] When the question of whether a defendant breached a plea agreement has been properly preserved for appeal, our review is de novo. *United States v. Williams*, 510 F.3d 416, 424 (3d Cir. 2007).

13

agreements stating that the U.S. Attorney's "Office and [the defendant in each case] … agree that neither party will argue for the imposition of a sentence outside the guidelines range that results from the agreed total guidelines offense level"[6] (JA at 199, 333), and that "[t]he parties agree not to seek or argue for any upward or downward departure, adjustment or variance not set forth herein." (JA at 199, 332.)

Campbell argues that the statements on his behalf were permissible because they simply encouraged the Court to apply the § 3553(a) factors. He also points to his counsel's statement that "I have not raised any issue as to the guideline range." (JA at 288.) Yusuf similarly contends that his proportionality argument was appropriate and that he was compelled to make it to advocate for fairness in sentencing. In neither case do we think the defendant-appellee's arguments justify the statements made at sentencing.

### 1. Legal Standard for Determining Breach

Our decision here is guided by *United States v. Williams*, a case in which we considered whether a defendant had breached the provisions of a plea agreement nearly identical to the ones before us now. 510 F.3d 416, 417-18 (3d Cir. 2007). As a matter of first impression, *Williams* also

---

[6] Again, sentencing ranges are a function of not only the pertinent offense level but also of the defendant's criminal history ranking, and neither Campbell nor Yusuf disputed their criminal history scores as calculated by the U.S. Probation Office.

14

determined what standard should govern when deciding whether a defendant has committed a breach. *Id.* at 417.

In *Williams*, the plea agreement stated that the U.S. Attorney's "Office and [the defendant] … agree that neither party will argue for the imposition of a sentence outside the Guidelines range that results from the agreed total Guidelines offense level." *Id.* at 418-19. Further, the parties agreed "not to seek or argue for any upward or downward departure or any upward or downward adjustment not set forth herein" and agreed also that the guidelines range for the appropriate offense level was reasonable. *Id.* at 419. At sentencing and in his sentencing memorandum, defense counsel said that he did not dispute the offense level, but he argued for a downward departure in the criminal history category, as well as variances under the § 3553(a) factors. *Id.* at 419-20. The government appealed, arguing that the defendant had breached his plea agreement. Defense counsel responded that, because the sentencing guidelines are only advisory, "*Booker* requires the Court to do a reasonableness analysis, when you consider those things, you can depart even though we stipulated it." *Id.* at 420.

In determining what standard should apply, we first recognize the well-established rule that "plea agreements, although arising in the criminal context, are analyzed under contract law standards." *United States v. Erwin*, 765 F.3d 219, 228 (3d Cir. 2014). That is so whether the government or the defendant is the allegedly breaching party. *Williams*, 510 F.3d at 424. In line with general principles of contract interpretation, we typically construe ambiguities against the government, given its customary role in drafting such agreements. *Id.* at 422 ("[I]n 'view of the government's tremendous bargaining power [courts] will strictly construe the

15

text against [the government] when it has drafted the agreement.'" (quoting *United States v. Floyd*, 428 F.3d 513, 516 (3d Cir. 2005))).

We went on to emphasize in *Williams*, however, that "a plea agreement necessarily 'works both ways. Not only must the government comply with its terms and conditions, but so must [the defendant].'" *Id.* (quoting *United States v. Carrara*, 49 F.3d 105, 107 (3d Cir. 1995)). "[A] defendant should not be permitted 'to get the benefits of [his] plea bargain, while evading the costs[,]'" we said. *Id.* (quoting *United States v. Bernard*, 373 F.3d 339, 345 (3d Cir. 2004)). Considering the needs of the criminal justice system generally, we observed that failure to "enforce a plea agreement against a breaching defendant … would have a corrosive effect on the plea agreement process." *Id.* Therefore, "[w]hen a defendant stipulates to a point in a plea agreement, he 'is not in a position to make … arguments [to the contrary].'" *Id.* (quoting *United States v. Melendez¸* 55 F.3d 130, 136 (3d Cir. 1995)). Our analysis led us to conclude that, "[t]he essential question [in a breach analysis] is whether the alleged breaching party's conduct is consistent with the parties' reasonable understanding of the agreement." *Id.* at 425 (internal quotation marks and citation omitted). Applying that standard, we determined that the defendant then before us had breached the plea agreement, and so we remanded for resentencing in accordance with the plea agreement. *Id.* at 428.

Our esteemed colleague Judge Joseph Weis dissented in *Williams*. He acknowledged "that as a general matter a defendant should not be permitted to renege on a valid and clear sentencing stipulation and a plea agreement." *Id.* (Weis, J., dissenting). But he argued that, because the agreement in

16

*Williams* only specified the offense level and not the criminal history category, the defendant had not breached the agreement when his counsel argued for a departure based on the criminal history category. *Id.* at 429-30. Particularly pertinent to issues before us now, Judge Weis stated that defense counsel also did not breach the agreement by arguing for a variance based on the § 3553(a) factors, "because the District Court invited and allowed the argument at the sentencing hearing." *Id.* at 430. He reasoned that "[t]o deny the sentencing judge the ability to carry out his statutory duty and responsibility through consent of the parties seems to undermine the sentencing procedure Congress has mandated." *Id.* at 432.

Both the majority and dissenting opinions in *Williams* looked to earlier precedents that considered whether the government had breached a plea agreement by statements it made at sentencing. While each case required a fact-specific inquiry, "the basic rules are clear." *United States v. Hodge*, 412 F.3d 479, 485 (3d Cir. 2005). When the government is alleged to have violated a plea agreement, we ask whether the "conduct [at issue] is inconsistent with what was reasonably understood by the defendant when entering the plea of guilty." *United States v. Badaracco*, 954 F.2d 928, 939 (3d Cir. 1992) (citation omitted). Although "[t]he government need not endorse the terms of its plea agreements 'enthusiastically[,]'" *id.* at 941 (citation omitted), "[t]he government must adhere strictly to the terms of the bargains it strikes with defendants[.]" *Hodge*, 412 F.3d at 485 (citation and internal quotation marks omitted).

For example, in *United States v. Badaracco*, the government assented in the plea agreement that, given the defendant's conduct, a potential two-point enhancement of the

17

offense level should not apply. 954 F.2d at 939. For that enhancement to apply, the defendant would have had to take significant affirmative steps to conceal his offense. *Id.* at 940. At sentencing, the government said that, in reality, "there was an affirmative step taken by [the defendant] indicating that he was concealing something[.]" *Id.* at 939 (emphasis omitted). We concluded that the government's "remarks about concealment were meant to serve as a possible basis for the district court to ignore the stipulation in the plea agreement[,]" and were therefore a breach of the plea agreement. *Id.* at 941.

Later, in *United States v. Nolan-Cooper*, when the government made an argument in response to questions from the district court, we considered whether it was a breach of the plea agreement. 155 F.3d 221, 238 (3d Cir. 1998). The government had agreed not to oppose the defendant's request for a three-level downward departure for acceptance of responsibility. *Id.* Nevertheless, at the sentencing hearing counsel for the government stated, "the Government does not believe that the defendant gave complete information." *Id.* Concluding that the government's comments undermined the defendant's claim that she should receive the full offense-level adjustment for acceptance of responsibility, we determined that the government had violated the plea agreement. *Id.* We expressly rejected the argument that our analysis should be altered because the government's comments were made in response to a question from the district court. *Id.* "While such questions may place the government in an uncomfortable situation, it still must inform the court that it cannot answer the question without breaching its plea agreement. Sometimes 'the better part of valor is discretion.'" *Id.* (quoting William Shakespeare, *Henry the Fourth Part I*, act V, scene iv, line 12).

18

### 2. Whether Campbell Breached His Plea Agreement

Here, the government argues that Campbell, like the defendant in *Williams*, explicitly argued for a sentence below the guidelines range in breach of his plea agreement. We agree.

As noted by the District Court, defense counsel's advocacy would be "more appropriate in a case where a variance is still provided for in the plea agreement and that's *not* a part of [Campbell's] plea agreement." (JA at 288 (emphasis added).) Paragraph 1 of Campbell's plea agreement states that the government and Campbell "agree that neither party will argue for the imposition of a sentence outside the Guidelines range that results from the agreed total Guidelines offense level." (JA at 199.) In addition, Paragraph 7 of the agreement unambiguously prohibits Campbell from "seek[ing] or argu[ing] for any upward or downward departure, adjustment or variance not set forth herein." (JA at 199.)

Despite that clear language, at sentencing Campbell twice requested a sentence of no jail time, in response to questions by his counsel.[7] (JA at 287 (stating "I would hope

---

[7] The government further argues that Campbell "exacerbated the breach" in his sentencing memorandum when he reminded the District Court that it has discretion to look beyond the guidelines, closing the memorandum by saying "the only question left to answer is does one treat Steven Campbell by the calculated Guideline formula or by an appreciation of the person, he has become." (Opening Br. at

19

Your Honor would consider probation, house arrest, community service, anything other than jail time[,]" in response to defense counsel's question of what a just punishment would be); JA at 290 (asking the Court to "grant [him] any punishment, except for jail time").) Those sentencing requests were indisputably below the agreed-upon guidelines range.

Campbell contends that he did not violate the plea agreement because he simply encouraged the Court to apply the § 3553(a) factors as permitted under Federal Rule of Criminal Procedure 32(i) and did not raise any issue as to the applicable guidelines range. That argument is wholly unpersuasive. As we recognized in *Williams*:

> nothing in the plea agreement prevented the District Court from departing downwardly or imposing a non-Guideline sentence on its own accord. The plea agreement did not purport to

---

21; JA at 221-23.) The government also points to letters of support attached to the memorandum advocating for leniency in sentencing (some asking for a non-custodial sentence). But the government raises these arguments for the first time on appeal. (JA at 268 (failing to object to Campbell's sentencing memorandum in its subsequent memorandum, instead stating, "[i]n accordance with the terms of the plea agreement, Campbell has not sought a variance").) Because Campbell's statements at sentencing, which the government did promptly object to, breached the plea agreement, we need not determine whether the government forfeited its arguments based on Campbell's presentence filings.

20

restrict the Court's duty to consider the § 3553 factors. Rather, the agreement merely prohibited [the defendant] from making arguments regarding those issues. If [the defendant] wanted to make a departure argument, it would have been prudent to negotiate a different agreement with the government.

*Williams*, 510 F.3d at 425-26.

Similarly, although courts must give both defense counsel and the defendant an opportunity to speak before imposing a sentence, we agree with the government that Rule 32(i) does not give defendants license to disavow their obligations under a plea agreement. *See United States v. Ward*, 732 F.3d 175, 182 (3d Cir. 2013) (declaring that "the defendant's right of allocution is not unlimited"). To hold otherwise would allow defendants to reclaim rights they bargained away to minimize sentencing exposure. That "would make the current system of plea agreements untenable because it would render the concept of a binding agreement a legal fiction[,]" *Williams*, 510 F.3d at 423, thereby jeopardizing an "essential" and "highly desirable" component of the administration of justice in criminal cases. *Santobello v. New York*, 404 U.S. 257, 260-61 (1971). Campbell breached his plea agreement and did so blatantly, to his own detriment.

### 3. Whether Yusuf Breached His Plea Agreement

Yusuf's case presents a much closer question, given its unusual procedural history (a resentencing following the sentencing of a co-conspirator for the same conduct in front of

a different district court judge) and the more nuanced argument the defense presented to the District Court. The foundational provisions of the plea agreement are, however, essentially the same as in Campbell's case. Paragraph 1 of Yusuf's plea agreement stated that the government and Yusuf "agree that neither party will argue for the imposition of a sentence outside the Guidelines range that results from the agreed total Guidelines offense level." (JA at 333.) In addition, Paragraph 12 of the plea agreement unambiguously prohibited Yusuf from "seek[ing] or argu[ing] for any upward or downward departure, adjustment or variance not set forth herein." (JA at 334.)

Yusuf's counsel acknowledged that he was bound by the plea agreement, but he nevertheless indicated that imposing the lowest guidelines sentence would be grossly disproportionate to Yusuf's co-conspirator's sentence "from a mathematical standpoint[.]" (JA at 429.) Specifically, defense counsel said that "simple math tells you that [the lower end of the guidelines range] is ten times, ten times the amount of time that [Yusuf's co-conspirator] got. I just don't see how we can all stand here and say, well, that somehow is a way, you know, the way this rolls out." (JA at 429-30.)

The unusual facts in Yusuf's case implicate at least two important procedural policies. First is the need for sentencing courts to have all material facts. As the District Court emphasized, Yusuf presented the "anomaly of two low level folks who clearly are a part … of … a vast conspiracy[,]" charged for the same crimes based on essentially the same conduct but sentenced by different judges. (JA at 430.) Those anomalous circumstances put the District Court and the defense in a particularly difficult position, given the strictures

22

of the plea agreement. Had Yusuf and his co-conspirator both been sentenced by the same judge, Yusuf may not have felt the need to so plainly point out the proportionality problem posed by his co-conspirator's sentence, because the judge would almost certainly have been aware of it.

While acknowledging that concern, the government nevertheless cites *Nolan-Cooper* to argue that the plain language of the bargained-for plea agreement must govern, regardless of how uncomfortable a position that may leave a party in when addressing the sentencing court. *See* Oral Argument at 5:00-6:36, http://www.circ3.dcn/iptvmedia/19-3472_19-3697_USAv.Yusuf_Campbell.mp3; *Nolan-Cooper*, 155 F.3d at 238. That argument, however, shortchanges the statutory duty of district courts to consider proportionality in sentencing under the § 3553(a) factors, a job they will be ill-prepared to do if not made aware of all material facts. Although Judge Weis's view of the appeal in *Williams* did not carry the day, we take to heart the wisdom of his observation that we should avoid eliminating a key source of information from sentencing judges and thereby impeding their ability to carry out their statutory duties. *Williams*, 510 F.3d at 432 (Weis, J., dissenting) ("To deny the sentencing judge the ability to carry out his statutory duty and responsibility through consent of the parties seems to undermine the sentencing procedure Congress has mandated.").

Along the same lines, the duty to consider the § 3553(a) factors includes a responsibility to take account of facts that arise after a plea agreement has been struck. The government essentially conceded the importance of after-arising facts when it stipulated in Yusuf's plea agreement that, "if this Office obtains or receives additional evidence or information prior to

23

sentencing that it determines to be credible and to be materially in conflict with any stipulation in the attached Schedule A, this Office shall not be bound by any such stipulation." (JA at 328.) It is equally important to ensure that defendants are able to notify the sentencing court of material after-arising facts, even when bound by plea agreement provisions like the ones at issue here.

The second policy we must bear in mind is the central role that plea bargaining plays in our criminal justice system. "Because a plea agreement is a bargained-for exchange, … we reach the same conclusion when a defendant breaches a plea agreement as we would reach if the government breached." *Williams*, 510 F.3d at 422 (citation omitted). To hold otherwise would leave the government with no meaningful recourse if it performed its side of the agreement but did not receive the benefit of the deal in return, potentially leading to a chilling effect on plea bargaining overall. Such a result would be intolerable "because our criminal justice system depends upon the plea agreement process." *Id.* at 423 (citation omitted).

With those considerations in mind, and consistent with our precedent describing the government's obligation in similar situations, we hold that Yusuf did breach his plea agreement.[8] Central to our decision is the fact that defense

___

[8] Yusuf also argues that the same government prosecutor did not object to similar statements made during co-conspirator Adekunle's sentencing hearing months earlier (where the parties were bound by the same plea agreement

24

provisions). He references the following exchange from Adekunle's sentencing:

> *Defense Counsel*: Another issue that the Court should consider is the previous sentence to the co-defendant, which was imposed by another judge, of 27 months. I would urge the Court to consider that portionality [sic] in sentencing –
>
> *The Court*: Just to make a clear record, state the name of the person and the nature of the sentence.
>
> *Defense Counsel*: Yes, sir. It was Mr. Yusuf, and he received a 27-month sentence …. I am constrained from arguing a below guideline sentence. The lowest guideline sentence under the six-month split sentence would still be above Mr. Yusuf's sentence….
>
> *The Government*: So let's just look at Count 1, and I know defense counsel brought to your attention [i.e., the sentence of Mr. Yusuf], *as she should*, and I'm going to bring to your attention misuse of sentencing….
>
> *The Government*: So, Your Honor, we have a situation where, yes, I think Your Honor has to take Mr. Yusuf's sentencing into account to some degree, but Your Honor has to also take into account all the other sentencings.

(JA at 368-74 (emphasis added).) While we are sympathetic to Yusuf's argument that the government's position at Adekunle's sentencing emboldened him to raise his

25

counsel not only pointed out the existence of Adekunle's lower sentence but went on to suggest that the bottom of the guidelines range was therefore too long a sentence for Yusuf.

Although we agree with the District Court that it would be wrong to prevent Yusuf from bringing the fact of Adekunle's sentence to the District Court's attention (*see* JA at 439), here Yusuf did more than merely present a fact. He went on to affirmatively advocate for a sentence below the agreed upon guidelines range. The distinction may be a fine one, but it is important. Had Yusuf only informed the District Court of Adekunle's sentence and reminded the Court that he was bound by the plea agreement, the Court may well have intuited the argument that was left unsaid. *Cf. Nolan-Cooper*, 155 F.3d at 238 (noting the prosecution's obligation to "inform the court that it cannot answer the question without breaching its plea agreement"). But leaving it unsaid is the difference between breaching and not breaching the agreement.[9] *See Williams*,

---

proportionality argument, we agree with the government that the advocacy in Adekunle "differed quantitatively and qualitatively" and therefore Yusuf had no reasonable basis to rely on the government's actions in Adekunle's case. (Appellant Supp. Ltr. at 1.) As the government points out, Adekunle's counsel twice pointed out that she was bound by the terms of the plea agreement and limited her advocacy to "bringing the necessary facts and circumstances to the Court's attention." (JA at 378.)

[9] Recognizing the delicate balance of interests at play in these circumstances, we respectfully encourage our colleagues on the district courts, whose responsibilities at sentencing are

26

510 F.3d at 422 ("[U]nder the law of this circuit, [a defendant] cannot renege on his agreement. When a defendant stipulates to a point in a plea agreement, he is not in a position to make . . . arguments [to the contrary.]") (citations and internal quotation marks omitted).

### 4.       Remedy for Breach

"When the government breaches a plea agreement, the general rule is to remand the case to the district court for a determination whether to grant specific performance or to allow withdrawal of the plea." *Nolan-Cooper*, 155 F.3d at 241. That principle also applies when the defendant breaches the plea agreement, and, in this case, specific performance means resentencing. "[W]e have observed that 'when the government requests specific performance at the hands of a defendant's breach [of the plea agreement], ... resentencing under the terms of the executed plea agreement might be the only appropriate remedy.'" *Erwin*, 765 F.3d at 231 (quoting *Williams*, 510 F.3d at 427-28).

"It is also the rule in this circuit that if specific performance is the applicable remedy, the defendant must be resentenced by a different district judge than the one who presided over the now-vacated original sentence." *Nolan-Cooper*, 155 F.3d at 241. We hasten to reiterate that "remanding to a different district court judge does not reflect upon the District Judge's prior decision" and that the remand "is not attributable to any error by the sentencing judge."

never easy, to be particularly mindful of the strictures on counsel when plea agreement provisions like the ones here are in place.

*Williams*, 510 F.3d at 428 (citation omitted). Rather, "[a] sentencing judge could be influenced inadvertently by the breaching party's prior arguments when the case is remanded for re-sentencing." *Id.* Therefore, consistent with the government's request in these two cases, we remand to different district court judges for resentencing.[10]

### B. Campbell's Motion to Suppress[11]

Campbell cross-appealed the denial of his motion to suppress. He claims that the police officer unnecessarily prolonged the traffic stop in violation of the Fourth Amendment.[12] His argument fails.

---

[10] Our concurring colleague has well expressed our respect for the judges who imposed sentence in Campbell's and Yusuf's cases. Since we are compelled to direct resentencing by different judges, however, we note that there may be efficiencies in sending Yusuf's case to the same judge who sentenced Yusuf's co-conspirator, Adekunle.

[11] We review the denial of a motion to suppress for clear error as to the underlying facts, but exercise plenary review "as to its legality in light of the court's properly found facts." *United States v. Donahue*, 764 F.3d 293, 298 (3d Cir. 2014) (quoting *United States v. Crandell*, 554 F.3d 79, 83 (3d Cir. 2009)).

[12] To the extent Campbell may be asserting lack of reasonable suspicion for the traffic stop, that argument also fails. "A police officer who observes a violation of state traffic laws may lawfully stop the car committing the violation."

Campbell says that the officer impermissibly prolonged the stop to continue an "eyeball search" while Campbell looked for his registration and proof of insurance. He is correct that any inquiries unrelated to the purpose of a traffic stop that "measurably extend [its] duration" are unconstitutional, *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (citation omitted), but "ordinary inquiries incident to a traffic stop … which serve the purpose of enforcing the traffic code" certainly are constitutional, *United States v. Green*, 897 F.3d 173, 179-80 (3d Cir. 2018) (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's

---

*United States v. Thompson*, 772 F.3d 752, 759 (3d Cir. 2014) (citation omitted). That analysis is objective. Therefore, what matters is not what is in the mind of the officer making the stop but whether, given the particular circumstances, a reasonable officer could articulate sound reasons for it. *See Whren v. United States*, 517 U.S. 806, 812-13 (1996); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 739 (2011) (Courts will "not look behind an objectively reasonable traffic stop to determine whether racial profiling or a desire to investigate other potential crimes was the real motive.") In Campbell's case, there is ample evidence that a reasonable officer could rely on to articulate particularized reasons for the traffic stop. The officer testified that he first ran Campbell's plates because of a license plate violation, and, after discovering the owner of the vehicle had a suspended license, he verified that Campbell was the driver before pulling him over. That testimony was supported by camera footage documenting the stop.

29

registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. Officers should be reasonably diligent in performing those tasks, and the Supreme Court has stated that the best indication of whether an officer has been reasonably diligent is by "noting what the officer actually did and how he did it[.]" *Id.* at 357.

Here, the officer did not unnecessarily prolong the stop. Approximately five minutes elapsed from the time the stop commenced to when Campbell was arrested. Although the officer suggested that Campbell look in the console again for his insurance card, the search for the insurance card and registration was a plainly valid reason to continue the stop. Furthermore, there was nothing nefarious in the suggestion to look in the console, as Campbell had not yet produced the necessary documents and the console is a commonly used storage compartment in vehicles. There was no error in the District Court's ruling that the officer did not unnecessarily prolong the stop.[13]

---

[13] Campbell claims he was stopped because he is Black; however, he has provided no basis to support an Equal Protection claim. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

### III.  CONCLUSION

Because both defendants breached their plea agreements, albeit to different degrees, we will vacate their sentences and remand for resentencing.  In addition, we will affirm the denial of Campbell's motion to suppress.

McKee, J. concurring

I join my colleagues' thoughtful opinion in its entirety. I write separately only to emphasize two concerns. First, as the Majority Opinion explains, the fact that we are remanding to a new judge for resentencing in no way reflects upon the two fine judges who imposed the sentences in these cases.[1] Both are thoughtful and experienced jurists with many years of distinguished service to the bench and their communities. However, as the Majority notes, our precedent requires that whenever we remand for resentencing because a plea agreement has been breached, a different judge must conduct the resentencing.[2]

Second, our holding should not be read as suggesting that a sentencing judge cannot interact with a defendant, the defendant's family, or anyone else whom the judge may want to hear from at sentencing to determine the appropriateness of a particular sentence. Each of the judges on this panel have been trial judges and we are well aware of how agonizingly difficult it can be to impose a sentence in a criminal case. Sentencing someone to a period of imprisonment impacts families and communities as well as the defendant. In order for judges to discharge their obligations to the defendant, to victims of crime and to the community, it is imperative that they be able to engage in a dialogue with a defendant and the defendant's family, as well as anyone else who may be able to better inform the judge about a defendant or the circumstances surrounding the offense of conviction. Such dialogue often does much more than assist in deciding upon a sentence. The discussion with a defendant is particularly important because it may go a long way towards convincing the defendant that s/he was heard and treated fairly. This, in turn, may well afford the defendant some measure of the respect and decency necessary to a successful return to the community at the completion of the sentence.

Courts should not feel that they are between the proverbial "rock and a hard place" by encouraging a defendant to speak while remaining cognizant of the strictures imposed

---

[1] *See* Maj. Op. at 25.
[2] *Id.*

by a plea agreement and our opinion today should not be interpreted in that vein. What occurred here went beyond an attorney affording the judge an opportunity to hear from a client or facilitating a client's right of allocution. The proceedings here can best be described as "an invitation to breach." This is best demonstrated by the conduct of Campbell's attorney.

During the sentencing hearing, when asked whether he had "anything further," Campbell's attorney replied: "Yeah. I've got an argument to make."[3] And *argue* he did. Although counsel attempted to describe what was to follow as Campbell's right of allocution,[4] as my colleagues explain, it was indeed an argument and it was a flagrant breach of the plea agreement.[5] After Campbell addressed the court and informed the judge about his background, expressed remorse, and gave certain assurances about how he would conduct himself in the future, his attorney asked: "How does giving you leniency reflect upon the seriousness of your offense?"[6] This was, of course, a not-so-veiled invitation to mitigate the § 3553(a)(2)(A) factor.[7]

Nor did counsel stop there. Instead, he forged ahead and asked his client to lend the court a helping hand by suggesting an appropriate and just sentence. Counsel asked his client: "What is a just punishment for your offense?"[8] Not surprisingly, Campbell did not respond that it would be a sentence consistent with the plea agreement. Rather, he asked for a sentence that was totally inconsistent with the plea agreement. He stated: "I would hope Your Honor would consider probation, house arrest, community service, anything

---

[3] JA at 279.

[4] *Id*. ("[M]y client has got an allocution he'd like to make as well as a statement he'd like to give to the Court.").

[5] *See* Maj. Op. at 20.

[6] JA at 286.

[7] 18 U.S.C. § 3553(a)(2)(A) requires the court to consider "the need for the sentence imposed-- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."

[8] JA at 287.

2

other than jail time."[9]  He had, of course, agreed to plead guilty in return for a sentence that would include incarceration.  Thus, while purporting to acknowledge the plea agreement, counsel encouraged his client to ask the court for anything *but* the agreed upon sentence.

Counsel then proceeded to pour more gild on the lily just in case the court had somehow managed to miss his client's "ask."  He asked Campbell, "Why will giving leniency protect the public from further crimes by you?"[10]  Campbell then assured the court that he had "learned [his] lesson" and would be crime free "for the rest of [his] life."[11]  Undeterred by the Government's well-founded objection, counsel plowed still deeper and asked the judge to give his client a break despite the negotiated plea.  Speaking through his client, counsel asked: "Why should [the judge] give you a break?"[12]

As the Majority notes, plea agreements "are analyzed under contract law standards."[13]  The law has long taken this approach even though negotiated plea agreements are indeed a very strange breed of contract.  Not only does the Government have "tremendous bargaining power[;]"[14] it is also hard to imagine another context in which the law enforces a "contract" where one party knew s/he faced years of imprisonment (or even execution in some cases) if s/he didn't agree to the other party's terms.

Nevertheless, the law has traditionally applied contract principles to plea agreements, and we thus require that parties to a plea agreement not breach the terms of a negotiated plea. Here, attorneys for both Yusuf and Campbell breached those terms.  Campbell's attempt to provide the court with additional information is a textbook example of verbal compliance accompanied by the old "wink and a nod."  This certainly does

---

[9] *Id.*

[10] *Id.* at 289.

[11] *Id.*

[12] *Id.*

[13] Maj. Op. at 14 (citing *United States v. Erwin*, 765 F.3d 219, 228 (3d Cir. 2014) (internal quotation marks omitted)).

[14] *Id*. (citing *United States v. Floyd*, 428 F.3d 513, 516 (3d Cir. 2005) (internal quotation marks omitted)).

not mean that one who signs a plea agreement forfeits the right of allocution and thereafter can make absolutely no statement to the court. It does mean that counsel cannot orchestrate a presentation that is clearly intended to shred a plea agreement while purporting to merely inform the court and safeguard a client's right of allocution.